# EXHIBIT 6

Attachment F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------- X

UNITED STATES OF AMERICA,

Plaintiff,

-against-

Docket No.
CV 02-2382

NASSAU COUNTY, THOMAS GULOTTA, Nassau County Executive, NASSAU COUNTY SHERIFF'S DEPARTMENT, and EDWARD REILLY, Sheriff of Nassau County,

Defendants.

---------------------------------------- X

SETTLEMENT AGREEMENT

I. Introduction

1. On April 19, 1999, the United States, through the Department of Justice ("DOJ") notified Nassau County Executive Thomas Gulotta of its intent to investigate certain conditions at the Nassau County Correctional Center ("NCCC") to determine whether those conditions violated inmates' constitutional rights. The United States conducted this investigation pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. §§ 1997 et seq., and the pattern or practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141.

NCCC and that such care is provided pursuant to a contract with the NUMC which sets forth the terms and conditions of the relationship between the County of Nassau and its agencies and NUMC. Nassau County shall be responsible for ensuring that NUMC complies with the terms of this agreement. Nothing in this paragraph shall abrogate Nassau County's responsibility to comply fully with the terms of this agreement.

6. It is expressly understood and acknowledged that, while this agreement makes no distinctions between those issues concerning inmate care, custody and control previously modified and or improved prior to the issuance of the Findings Letter and those which shall be modified and/or improved by virtue of the terms of this agreement, the parties acknowledge that a number of the policies and/or procedures which this agreement addresses were implemented or in the process of being implemented prior to the issuance of the Findings Letter.

## II. Medical and Mental Health Care

### A. Policies and Procedures

7. NCCC shall cause to be developed and/or implemented appropriate written medical policies, procedures, and protocols that include, but are not limited to the following: (1) initial inmate screening and inmate health assessments; (2) staffing levels, necessary credentials and job descriptions; (3) sick call and other access to medical services; (4) distribution

professional" shall be defined only as a licensed physician assistant or licensed nurse practitioner. "Clinical staff" shall be defined as nursing staff and medical staff.

9. All security personnel shall be trained to provide first response assistance in an emergency situation (i.e., CPR, bag valve resuscitation and/or to address serious bleeding.) Security personnel and Emergency Technicians ("EMTs") and Advanced Medical Technicians ("AMTs") shall not provide medical, dental or mental health, evaluation, diagnosis, or treatment, other than as first line emergency medical response. Security personnel may assist a physician or allied health professional in emergencies. Emergencies shall not include situations in which non-emergent medical, dental or mental health care treatment is necessary or is being provided, and medical staff is unavailable to provide such treatment.

10. NCCC shall make reasonable efforts to ensure an inmate's privacy subject to legitimate security concerns and emergency situations.

11. The medical director of the NCCC shall be a qualified, licensed physician. Qualified, licensed physicians shall supervise inmate medical and mental health treatment, and medical policy development. The medical director of the NCCC shall have ultimate responsibility for supervising all medical and clinical staff, although nursing personnel may be

14. NCCC shall ensure that NUMC retains psychiatrists and psychiatric social workers at staffing levels sufficient to provide adequate treatment of inmates' serious mental health needs.

15. NCCC shall ensure that NUMC maintains monthly reports setting forth all medical staffing positions filled and unfilled on the first day of each reporting period. This report shall include all personnel/professional job classifications, as defined above.

C. Intake Screening

16. NCCC shall perform timely initial health screening for new inmates on the day of arrival in accordance with 22 N.Y.C.R.R. § 7010.2 and shall make every good faith effort to record and seek the inmates' cooperation to provide (1) medical, surgical, mental health, and dental history; (2) current injuries, illnesses, evidence of trauma, and vital signs; (3) current medications; (4) allergy information; (5) personal physician(s), dentist(s), and mental health provider(s); (6) immunization history as follows: influenza; pneumococcal vaccine for inmates fifty (50) or over or with chronic disease; hepatitis; (7) mental health screening to include suicide attempt history, history of mental health including hospitalization, suicidal ideation and risk assessment; (8) history of substance abuse and treatment; (9) pregnancy; (10) history or symptoms of tuberculosis,

19. As part of intake screening, NCCC shall routinely administer to all inmates a blood test for syphilis and shall provide medically appropriate treatment within ninety-six (96) hours of testing.

20. Pneumococcal and influenza vaccinations shall be provided to inmates in accordance with CDC guidelines, unless NCCC's physician deems such vaccinations medically inappropriate, in which case, such determination shall be recorded with specificity in the inmate's chart.

21. Inmates with Hepatitis C shall be treated in accordance with CDC guidelines, unless NCCC's physician deems such treatment medically inappropriate, in which case, such determination shall be recorded with specificity in the inmate's chart.

22. In the event an inmate refuses to voluntarily cooperate in the screening and/or test(s) referred to in paragraphs 17-21, after being advised of its importance to the inmate's health needs, then such refusal shall be documented by medical center personnel. In such event, NCCC shall take steps medically appropriate for the health of the individual inmate, other inmates and staff.

23. A physician or allied health professional shall perform full health assessments within seven (7) days of an inmate's arrival at NCCC, unless the intake screening indicates the inmate has a contagious illness, is on medication, has

physician is on call twenty-four (24) hours a day, seven (7) days a week, for immediate access by allied health professionals. Nurses shall be guided by physician approved nursing protocols.

27. NCCC shall develop and implement written sick call policies, procedures, and practices which shall include, at a minimum, the following: (1) written sick call request slips available in English and Spanish; (2) a confidential collection method in which the request slips go directly to the medical personnel; (3) a logging procedure to record each request for sick call services, the date the inmate was seen, and the disposition (e.g., referral; whether inmate seen at sick call) of the sick call visit; (4) procedures and policies that ensure that all sick call requests are evaluated by clinical staff within 24 hours; (5) procedures and policies that ensure that medical evaluation and treatment occurs in a manner that is timely for the medical complaint; (6) procedures and practices which ensure that illiterate inmates can orally access the sick call system by requesting access through staff, who must, as soon as reasonably possible after the oral request, fill out a request slip for the inmate; (7) procedures and practices which ensure that inmates with visual impairments, who are blind, or who have physical or cognitive disabilities which impair their abilities to complete sick call slips, can orally access the sick call system by requesting access through staff, who must, as soon as reasonably possible after the oral request, fill out

to, the following conditions: asthma, cardiac disease, elevated lipids, diabetes, HIV infection, hypertension, and seizure disorder.

31. NCCC shall develop and implement a written updated chronic disease treatment guidelines consistent with nationally accepted guidelines for the diseases, in order to provide appropriate treatment for chronic illnesses, including routine tests, examinations, follow-up, treatment plans and continuity and coordination of care.

32. NCCC shall keep records of all care, including routine tests and examinations provided to inmates suffering from chronic illnesses. Such records shall be maintained in the inmate's individual file.

F. <u>Medication Management</u>

33. NCCC shall develop and implement written policies and procedures to ensure appropriate delivery and continuity of medication. Such procedures shall include timely distribution of medication to inmates who have visits or are out to court; procedures that ensure access to medication in emergencies and on weekends; contemporaneous documentation and monitoring of dosages dispensed and received and documentation of refusals and no-shows; and procedures that ensure that medication errors are recorded and monitored.

34. Only trained and qualified medical staff shall administer medications. NCCC shall provide pharmaceutical

treatment. For purposes of this provision, the number of days shall commence beginning with the day the inmate is released from detention. NCCC shall develop and implement written policies and procedures which facilitate continuity of medication upon release, including, but not limited to assisting inmates with accessing public health benefits and services. Nassau County may seek to recover from individuals with private medical coverage or medical insurance the costs of medication provided pursuant to this provision.

G. Medical Records

38. NCCC shall develop and implement written policies and procedures for maintaining unified and collaborative health records. Such procedures shall include maintenance of a single medical record for each inmate covering all admissions to NCCC, inclusion of current notes from all health care providers, and all medication administration records. All medical records, including laboratory reports, etc., shall be timely filed (i.e., within three (3) days of review, creation, or use).

39. Medical records shall be separate from the inmate's institutional record. Access to individual inmate medical records shall be restricted to medical personnel and to the legal section of the jail and the County when necessary to respond to formal complaints of failure to provide medical care or those alleging injury due to excessive force. Medical information shall be shared with NCCC officers only when the director of the medical unit or the Sheriff or his designee or

44. NCCC shall use its best efforts to expand the size of its Drug, Alcohol, Rehabilitation Treatment ("DART") and "Stop DWI" programs to accommodate additional participation.

45. NCCC shall maintain waiting lists for its substance treatment programs and shall document the number of individuals requesting, receiving, and denied such treatment.

J. <u>Mental Health Treatment and Special Needs</u>

46. NCCC shall develop and implement treatment plans for inmates with special needs, such as the frail elderly, and inmates with mental illness, disabilities, communicable diseases, or terminal illness. Treatment plans shall include discharge planning.

47. NCCC shall develop and implement written policies and procedures to ensure that inmates requesting mental health services, inmates who become suicidal and inmates who develop serious mental illness while incarcerated are evaluated and treated timely, irrespective of the manner in which the services are requested. A sufficient number of hospital beds shall be available for acute mental health inmates who are determined by medical staff to require hospitalization. Mental health staff shall be provided with up to date housing lists of inmates to ensure continuity of care. Inmates with positive suicide screens shall be provided with active supervision and shall be timely seen and evaluated by mental health staff.



Gazzola- Nassau County 984

treatment of tuberculosis. NCCC shall train all staff on these plans on an annual basis. Only trained staff shall perform medical waste disposal and clean-up.

52. NCCC shall develop and implement a written exposure control plan that is consistent with OSHA requirements.

53. NCCC shall maintain a clean and safe environment in all medical areas, including establishing and implementing controls regarding dangerous medical instruments and medical waste disposal.

M. <u>Inmate Education</u>

54. NCCC shall implement a regular program for educating inmates on health related issues, including HIV education and counseling, other infectious diseases, diseases with which they have been diagnosed, and birth control education and counseling.

N. <u>Quality Assurance and Improvement</u>

55. NCCC shall develop and implement a written functional quality improvement program for medical and mental health care, which shall include development of a written quality improvement plan that includes annual self-evaluation, the provision of evaluations and recommendations regarding clinical guidelines, the selection of performance indicators, internal peer review and the establishment of a Quality Improvement Committee ("QIC"). The QIC shall be responsible for



Gazzola- Nassau County 985

or his designee in writing regarding any change in the status of any such matter. The failure to so report shall result in disciplinary proceedings. NCCC shall independently monitor the status of any matters reported to the facility by staff pursuant to this paragraph and shall evaluate the propriety of such staff's continued contact with inmates and remove staff from such contact where appropriate. All statements required in this paragraph shall be maintained in the files of the investigation unit and/or the employee's personnel file.

60. NCCC shall request in writing that the District Attorneys of Nassau, Suffolk, Kings, Queens, Richmond, New York, and Bronx Counties notify the Sheriff or his designee of NCCC staff convictions or pleas described in paragraph 59. NCCC shall request in writing that the Nassau County Attorney's Office advise NCCC of any judgment, civil adjudication or settlement against a NCCC employee for actions filed pursuant to 42 U.S.C. § 1983 and of any adjudicated administrative determinations against NCCC employees or any administrative settlements entered by NCCC employees related to claims of discrimination. NCCC shall evaluate the propriety of such staff's continued contact with inmates and remove staff from such contact where appropriate.

61. Prior to hiring, it is understood and agreed that the Nassau County Civil Service Commission shall perform all background checks on all candidates for correctional positions and shall evaluate the results of such checks in hiring or

social worker or qualified health care professional and one member of the Training Academy. Following these interviews, the committee shall select staff members deemed appropriate for assignments to posts in the mental observation units or to specialized units with alcohol or drug dependent inmates. Staff assigned to such posts on a steady basis shall receive special training which shall include topics related to use of force, an overview of treatment issues, and to understanding and dealing effectively with these special populations. NCCC shall make reasonable efforts to make assignment to such posts voluntary.

64. NCCC shall provide at least forty (40) hours of in-service training annually to correctional staff. Training shall include the use of force topics identified in paragraph 62, use of force reporting, staff professionalism, diversity training, potential criminal and civil liability for the use of excessive force, and stress reduction. NCCC shall develop and provide special in-service training to staff assigned to posts in mental observation units and in specialized units with alcohol or drug dependent inmates. Such training shall include the topics described in the preceding paragraph. All correctional staff shall receive in-service training concerning issues related to dealing effectively with women inmates. The hours necessary for such training shall be determined by NCCC with input by DOJ. The training materials and course structure for the in-service training described in this paragraph shall



Gazzola- Nassau County 987

call scripts shall be provided to DOJ for its review in accordance with the time frames for compliance set forth below.

C. Policies and Procedures

It is acknowledged that NCCC is in the process of developing and implementing a use of force policy. NCCC's revised procedures and polices regarding the use of force shall include the following provisions:

68. The revised policies and procedures shall define the "use of force" as (1) the use of chemical agents; (2) the non-routine use of restraints (i.e. use of restraints for purposes other than routine purposes such as handcuffing inmates for transport); (3) the use of deadly force; (4) any physical contact with an inmate initiated by a staff member for the purpose of controlling the inmate's movement or behavior, provided, however, that the simple placement of an employee's hands on an inmate shall not constitute a use of force; (5) the use of any weapon (firearm, baton, etc.) even where no contact results (e.g. discharge of a firearm) provided, however, that threatening to use a weapon by waving or brandishing it shall not constitute a use of force; and (6) any of the above conduct used by inmates or other individuals against an inmate at the request or direction of correctional staff. The polices and procedures shall provide that (1) correctional staff may use physical force only when necessary and legally permissible; (2) correctional staff must make efforts to resolve inmate misconduct without the use of force, and if force is necessary,

(6) inmate in the process of escaping; (7) correctional staff acting in self-defense, if the staff member cannot maintain a safe distance in complete safety without compromising security; (8) enforcement of institutional regulations in order to temporarily isolate or otherwise confine or secure an inmate where lesser means have proven ineffective; (9) prevention of a serious or violent crime or apprehension of an inmate who has committed such a crime; (10) quelling riots; (11) inmate disobeying an order where that disobedience is likely to cause serious bodily injury or threatens to escalate into a general disturbance; and (12) inmate engaged in conduct that causes a reasonable person to believe that the inmate is about to commit any offense listed in this paragraph.

70. The revised policies and procedures shall prohibit the use of force: (1) where the inmate is engaged in verbal outbursts or verbal abuse of staff members, unless such verbal outburst is likely to incite a general disturbance which may cause injury to inmates, staff or visitors; (2) where the inmate is destroying his or her own property; (3) where the inmate is engaged in destruction of county property of insubstantial value; (4) to punish or retaliate against an inmate; (5) to discipline an inmate for failing to obey an order; (6) after an inmate has ceased to offer resistance warranting an initial use of force; and (7) where an inmate is restrained in a mechanical device, unless such force is the

73. The revised policies and procedures shall establish a use of force continuum that includes, at a minimum, the following categories of graduated responses and detailed procedures relating to the application of each type of response: (1) dialogue; (2) verbal commands; (3) non-impact, soft or passive control techniques; (4) chemical agents; (5) mechanical devices, such as electronic immobilization devices; (6) physical restraints; (7) impact weapons; (8) impact strikes; and (9) lethal force and dangerous weapons. NCCC shall develop and/or implement specific policies and procedures governing each type of force (e.g., chemical agents, mechanical devices, etc.) The use of force policy shall reference all policies and procedures governing each type of force. All policies and procedures relating to types of force shall be submitted to DOJ for its review in accordance with Section IV, paragraphs 121-123.

74. The revised policies and procedures shall require correctional staff to notify his/her superior officer, who shall thereafter notify the Tour Commander, prior to using force, absent circumstances in which an immediate resort to the use of force is necessary. Such planned uses of force shall be under the direction of the Tour Commander and shall be videotaped. The revised policies and procedures shall provide that any correctional staff member using force without first



Gazzola- Nassau County 990

extent practicable; for training personnel assigned to film uses of force in the use and maintenance of such equipment; for disciplining staff who fail to videotape incidents as required; for disciplining staff who tamper with the videotape machines or tapes; and for reviewing regularly the tapes. NCCC shall maintain the used tapes for three years to ensure that evidence is not destroyed or lost. No tapes containing relevant evidence shall be destroyed during the pendency of any civil, criminal, or administrative investigation, prosecution, or litigation.

E. <u>Reporting, Medical Examinations and Preservation of Evidence</u>

76. Unless the Tour Commander has been notified of a use of force pursuant to paragraph 74, the sergeant who is responsible for supervising the area where a use of force incident occurred shall page and notify the Tour Commander of the incident within thirty (30) minutes of the use of force. Upon receiving such notice, or when the incident has ended, the Tour Commander shall report all known facts to the Core Control Desk, i.e., the control center for the security staff on duty in the core facility. The Core Control Desk shall have the Undersheriff and/or Deputy Undersheriff responsible for investigations, or designee, paged and notified of the incident within sixty (60) minutes of notice of the incident. NCCC

persuasion or warning preceding the use of force and the inmate's response; whether the Tour Commander was notified prior to the use of force, and if not, an explanation for the failure to do so; whether the use of force was videotaped; whether the inmate was armed, and if so, the type of arms; whether injuries were sustained, and by whom; whether control holds were employed; the specific type of force that was used; whether chemical spray or any other force or restraint device was used; the time that medical staff examined the inmate and staff; and the names of all inmate and staff witnesses.

79. NCCC shall develop and implement policies and procedures that require the Tour Commanders to assign a "designated sergeant" to review the use of force reports. The sergeant responsible for supervising the area where the use of force incident occurred shall be so designated unless he/she authorized, witnessed, or participated in the use of force incident. In such cases, the Tour Commander shall assign another sergeant on duty to review the reports. The designated sergeant shall review the report for completeness and accuracy. If the designated sergeant determines that the report(s) is not complete or accurate, the sergeant will direct the writer of the report to submit an addendum to the report. The designated sergeant shall review the use of force report within four (4) hours of receipt and shall forward it, and any addendum, to the Tour Commander.

medical treatment except in those situations requiring employment of the Sheriff's Emergency Response Team ("SERT") where member of the SERT team shall escort the inmate to the medical unit (or NUMC).

84. NCCC shall develop and implement written policies and procedures for investigating and tracking injuries to inmates. Such procedures shall include, at a minimum, requirements that designated correctional personnel: review each such injury report; interview inmates who refuse or are unable to sign the section of the form describing the cause of the injury; conduct full investigation where an inmate's injuries are inconsistent with the claimed basis for the injury; and conduct full investigation where the reporting correctional staff member is one whose name is reported on the quarterly report described in paragraph 107.

85. NCCC shall require medical personnel to record all injuries and report suspicious injuries (e.g., unexplained, serious or multiple injuries to an inmate; injuries resulting in the inmate being hospitalized and injuries involving the inmate's head or genital areas; body welts) directly to the Sheriff or his designee. In such instances, the Sheriff or his designee shall take prompt steps to document the injury through photographic or recording devices. NCCC shall maintain enough working cameras to record such injuries, and shall identify and

evidence subject to destruction or loss or medical evidence subject to change is or has been investigated and to check the possible discharge dates of inmate witnesses to ensure that such witnesses are interviewed timely.

89. NCCC shall develop and implement policies and procedures for promptly removing staff from contact posts, where appropriate, following a use of force incident which indicates that the use of force may have been excessive or unnecessary.

90. A committee including the Deputy Undersheriff for Investigations, the Deputy Undersheriff for Security, the Deputy Undersheriff for Operations, the Sheriff or his designee, a representative from the Training Academy and a representative of the medical staff, when indicated, shall review all use of force reports on a monthly basis. The committee shall (1) write a report of each review; (2) timely refer all suspicious use of force reports to the SBI for investigation including, but not limited to, incidents involving unexplained, serious or multiple injuries to an inmate; incidents resulting in the inmate being hospitalized and incidents involving impact strikes to the inmate's head or genital areas; and (3) for any use of force not compliant with policy, recommend taking appropriate steps to impose discipline, training, or other remedial measures.

shall investigate all allegations of unnecessary or excessive use of force: (1) reported to SBI by inmates or third parties that were not previously reported to the facility; (2) found to be substantiated by the investigating Sergeant or Tour Commander; and (3) referred to SBI by the committee described in paragraph 90.

92. SBI shall review all grievances alleging unnecessary or excessive force and transmit such grievances to the appropriate correctional staff, e.g., supervisory sergeant or Tour Commander, for investigation. The investigation shall be conducted pursuant to the procedure set forth in paragraph 80, including, but not limited to, the assignment of an uninvolved sergeant to conduct the investigation. SBI shall thereafter review the investigatory package generated from the grievance in accordance with the procedure set forth in paragraph 91.

93. All SBI investigations of the use of unnecessary or excessive force shall be completed within sixty (60) days. The basis for any delays exceeding sixty (60) days shall be documented. The Undersheriff for Investigations shall maintain records tracking the timing of investigations.

94. SBI shall interview all staff and inmate participants and witnesses. Exceptions to this requirement shall be contained in a detailed written protocol established by the NCCC and the Nassau County District Attorney's Office. If the matter becomes the subject of a criminal investigation SBI

assure that a minimum of forty (40) hours of specialized training in investigations shall be provided to all current SBI investigators within sixty (60) days of the execution of this Agreement and to all future SBI investigators within thirty (30) days of assignment to the post, unless impracticable.

99. NCCC shall develop and implement written procedures outlining steps and methods for investigating allegations of improper uses of force. Such procedures shall include: timetables for conducting investigations; procedures for interviewing witnesses; procedures for evaluating physical, medical and witness testimony; requirements for utilizing medical and other experts; procedures for utilizing the data base described in this Agreement; witness and evidence checklists and a format for reporting the results of investigation. Among other things, the procedures shall provide that special weight shall not be given to information from witnesses because of their status as inmates or staff. The procedures shall be provided to DOJ for its review and approval in accordance with the procedures and time frames set forth below in Section IV, paragraphs 121 and 123.

100. Where appropriate or necessary, SBI shall work with experts to evaluate forensic and medical evidence.

101. Based upon the information obtained or provided to the Sheriff in compliance with the requirements set forth in paragraphs 59 and 60, SBI shall determine whether a staff

the computerized data base referred to in paragraph 104, or in another trackable data base.

104. SBI shall develop and implement a comprehensive and up to date computerized data base tracking complaints, grievances, incident reports, civil litigations, criminal prosecutions, and notices of claim involving the use of force, inaccurate reporting of use of force or failure to report use of force, whether substantiated or not. The data base shall also include complaints and grievances alleging bias against inmates based on gender, race, religion, age, ethnicity, sexual orientation, national origin or disability. The data base shall include the dates the investigation was commenced and completed, the names of assigned investigators, the date, outcome of the investigation, time and location of incidents, names and identification numbers of all witnesses and participants, names of supervisors on duty, injuries to staff or inmates, type of force used, reason given by staff for use of force, experts utilized, discipline and informal management responses to reported allegations. The data base shall also include injuries to inmates reported as slips and falls, or collisions with doors, walls or cell gates. The data base shall also include injuries to inmates charged with or convicted of sex crimes or crimes against law enforcement personnel or children. The data base shall be searchable by any of the elements included. Investigators, management and

All staff who are shown in a quarterly review to have been the participant in more than two (2) use of force or improper reporting allegations within the past five (5) years shall be the subject of a management review. Informal management responses shall be taken with regard to such staff, if appropriate. Quarterly reviews and all action taken pursuant to this provision shall be documented.

108. In connection with staff promotions, the Sheriff will consider all items in staff personnel files and in all records maintained by the Nassau County Sheriff's Department.

109. The committee described in paragraph 90 shall review on a quarterly basis the quarterly reviews described in paragraph 107, shall discuss substantiated uses of excessive force, and shall make recommendations, if appropriate, concerning modifications in policy, training, discipline, or other remedial measures.

110. NCCC shall develop and implement guidelines for the imposition of discipline. Such guidelines shall set forth the type of discipline (i.e. fine; reprimand; denial of the next year's increment; loss of leave entitlement; suspension without pay; demotion in grade and/or step; dismissal) to be imposed for violations of the policies and procedures established pursuant to this Agreement, and if applicable, the duration and/or amount of such discipline, not inconsistent with New

all current inmates. The handbook shall be subject to DOJ review and approval in accordance with the procedures and time frames set forth below in Section IV, paragraphs 121-123. NCCC shall add to the orientation video shown to incoming inmates the information described in this paragraph. To the extent practicable, the video shall be available in the above languages and with closed captioning.

113. NCCC shall post and maintain in all living areas and in other areas in which inmates spend significant time (such as library and recreation), visible posters in English and Spanish setting forth the procedures and telephone numbers for reporting complaints. This information shall be available in Braille to blind inmates.

114. A summary of this Agreement shall be created by the Joint Expert, reviewed by the parties and made available to inmates in the law library.

J. <u>Quality Assurance</u>

115. The Deputy Undersheriff for Investigations shall report on a bi-weekly basis to the Sheriff regarding SBI's work, including the timeliness of investigations, findings and patterns.

116. NCCC shall develop policies and procedures for conducting periodic, confidential, random interviews of inmates regarding conditions of confinement, including provision of medical and mental health care and the use of force. Inmates

121. All written policies and procedures relating to the use of force required under this Agreement to be reviewed and/or approved by DOJ shall be submitted to DOJ and an expert to be agreed upon by DOJ and NCCC (the "Joint Expert") within ninety (90) days of the execution of this Agreement.

122. All written policies and procedures relating to medical care required under this Agreement to be approved by DOJ shall be submitted to DOJ within ninety (90) days of the execution of this Agreement. DOJ shall notify NCCC in writing as to whether it approves the revised policies and procedures.

123. In the event that DOJ or the joint expert do not approve policies and procedures required to be approved pursuant to the terms of this Agreement, the parties will agree to a schedule for NCCC to submit revisions for appropriate approval.

124. NCCC shall implement policies and procedures approved by DOJ within forty-five (45) days of approval.

125. Upon fifteen (15) days notice, NCCC shall provide DOJ and the Joint Expert with any documentation requested that is not subject to the attorney-client privilege. The Joint Expert and representatives for DOJ, including its experts, shall conduct an initial on-site compliance monitoring tour: i) regarding medical issues approximately four months after execution of this Agreement; and ii) regarding use of force issues approximately six (6) months after execution of this Agreement. The duration of the on-site compliance monitoring



Gazzola- Nassau County 1000

130. In the event that the allegations in the underlying complaint are litigated (i.e. through a trial or dispositive motions), this Settlement Agreement shall not be introduced or used as evidence.

131. This Agreement shall be binding on all successors, assignees, employees, and all those working for or on behalf of the defendants to this action.

132. Notice under this agreement shall be provided by Federal Express overnight delivery and shall be provided to the Sheriff of Nassau County and to NCCC's counsel as designated by written notice to DOJ.

For the United States

ALAN VINEGRAD
United States Attorney
Eastern District of
New York

SANFORD M. COHEN
Chief, Civil Rights
Litigation

MARLA TEPPER
PAMELA CHEN
Assistant U.S. Attorneys
U.S. Attorney's Office
Eastern District of
New York
147 Pierrepont Plaza
Brooklyn, New York 11201

RALPH F. BOYD, JR.
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

MELLIE H. NELSON
Deputy Chief
DANA SHOENBERG
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
P.O. Box 66400
Washington, D.C. 20035-6400



Gazzola- Nassau County 1001

EDWARD REILLY
Sheriff of Nassau County

## Criteria for Hospital Admission or Emergency Department Transfers from Jail

### Nassau County, NY

*Guidelines to measure the severity of condition or intensity of service required by the Emergency Department or hospitalization:*

- Acute conditions requiring 4 liters of oxygen or more
- Impending or potential for respiratory failure
- Unresponsiveness of unknown etiology
- Panic lab values requiring IV access and/or telemetry monitoring
- Suspected sepsis (fever, unstable vitals, respiratory compromise)
- Cardiac conditions requiring telemetry, including hypertensive emergencies, unstable angina, acute coronary syndrome, arrhythmia, )
- Unresolved fever of unknown origin
- Persistent altered mental status after evaluation (exam, labs, fluid, etc), stupor or delerium
- OB conditions requiring fetal monitoring and/or sterile exam
- Suspected pre-term or active labor
- Sudden onset of vision deterioration or blindness
- Acute condition requiring surgical intervention or potential for intervention (such as evaluation for acute abdomen)
- Acute onset numbness/weakness
- Uncontrolled bleeding from anywhere (e.g. subcutaneous, any orifice, etc)
- Severe anemia or coagulation disorder requiring blood products

- Any acute/subacute condition that could lead to loss of limb or its function (e.g. compartment syndrome, trauma, open fractures or amputations or major joint dislocations)
- Acute loss of bowel/bladder function
- Acute escalating pain with or without unstable vitals that could result in loss of vital organs or their function (e.g. torsion of ovaries or testes)
- Toxic overdose (e.g. acetaminophen) or corrosive ingestion
- Status epilepticus
- Cardiac or pulmonary arrest
- Shock or impending shock
- Head injury with suspected intracranial bleed
- Other conditions requiring immediate, intensive and specialized intervention to preserve life, limb, or function, or potentially requiring same based on the reasonable medical assessment of an HCPP of an acute threat to the health and safety of the inmate.

## ATTACHMENT F