# EXHIBIT 8

NEW YORK STATE | Commission of Correction

# Final Report of the New York State Commission of Correction:

In the Matter of the Death of

Michael Cullum,
an inmate of the
Nassau County Correctional Center

June 27, 2017

To: Sheriff Michael J. Sposato
Nassau County Sheriff's Office
100 Carman Avenue
East Meadow, New York
11554

Thomas A. Beilein
*Chairman*

Thomas J. Loughren
*Commissioner*

80 South Swan Street, 12th Floor, Albany, New York 12210 | 518-485-2346 – phone | 518-485-2467 – fax | www.scoc.ny.gov

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47(1)(d), regarding the death of Michael Cullum who died on September 5, 2016 , as a result of circumstances which occurred while an inmate in the custody of the Nassau County Sheriff at the Nassau County Correctional Center, the Commission has determined that the following final report be issued.

FINDINGS:

1. Michael Cullum was a 62-year-old black male who died on 9/5/16 of thromboembolism of the pulmonary arteries due to deep vein thrombosis of both legs while in the custody of the Nassau County Sheriff at the Nassau County Correctional Center. Other contributing factors in his death were acute and chronic pancreatitis and opioid dependency. The Medical Review Board finds that Cullum's death was impacted by a failure of health care providers from Armor Inc. to adequately treat chronic illness, recognize and treat serious changes in Cullum's condition, provide adequate follow up on refusals of treatment and to provide a prompt transfer to a higher level of care when indicated. Additionally, the Medical Review Board noted three incidents where medications were administered without evidence of a physician's order. Despite the investigations of multiple deaths at the Nassau County Correctional Center since 2011with findings and recommendations from the Medical Review Board regarding systemic deficiencies in the delivery of adequate medical care, there has been a continued failure and unwillingness by Armor Inc. to address the identified issues. Conclusively, the Medical Review Board opines that contracted medical provider, Armor Inc., is incapable of providing competent medical care.

2. Cullum had two adult children. Cullum stated that he had a 12th-grade education and that he was unemployed due to his health. His next of kin was listed as his sister. A review of the record indicated that there was no information regarding Cullum's parents.

3. [redacted]

4. Cullum was arrested by the Glen Cove Police Department on 8/26/16 for Criminal Possession of a Controlled Substance and Criminal Sale of a Controlled Substance. Prior to detention, the Nassau County Police Department (NCPD) had Cullum evaluated by North Shore Long Island Jewish Hospital at 9:54 p.m. It was found that he was "not suffering from an emergency medical condition at the time of discharge that would preclude him from being confined".

5. At 12:40 a.m. on 8/27/16, Cullum was screened for suicide risk at the NCPD Detention Center. He scored one for history of substance abuse. The form is scored incorrectly as "Ø" although Cullum did answer one question with a yes. The NCPD "Physical Condition Questionnaire (PDCN-79SJ) documented that Cullum was asked if he

was in good health and Cullum responded "Not hardly, I have arthritis. I saw a doctor tonight". Cullum also denied injuries but stated that he was on a Methadone program.

6. At 9:56 a.m., Cullum was seen at Nassau University Medical Center (NUMC) and found to be fit for confinement per the policy of the NCCC. Available documentation did not indicate if this evaluation was a medical or psychiatric evaluation.

7. At 3:29 p.m., Cullum was admitted to the Nassau County Correctional Center. He screened positive on the suicide risk assessment due to the transporting officer believing that he may have been a suicide risk and admitting to a history of counseling/treatment. The form shows that the screening officer contacted a shift commander but does not indicate who and when. It also did not indicate what level of supervision was instituted.

8. [redacted]

9. [redacted]

10. [redacted]

[redacted] The Medical Review Board finds this a violation of NYS Commission of Correction Standard §7010.2(e) which states: "*No medication or medical treatment shall be dispensed to an inmate except as authorized or prescribed by the facility physician*" and a violation of NYS Education Law Article 139 Nursing; §6902 which defines the scope of practice of nursing as a registered professional nurse as "*executing medical regimens prescribed by a licensed physician, dentist or other licensed health care provider legally authorized under this title and in accordance with the commissioner's regulations.*"

11. [redacted]

12. [redacted]

13. [redacted]

14. [redacted] The Medical Review Board finds that this is a violation of Minimum Standard §7010.2(e) which states: "*No medication or medical treatment shall be dispensed to an inmate except as authorized or prescribed by the facility physician*".

15. [redacted]

16. [redacted]

[redacted] During interview with Commission staff, Armor Inc. staff were asked what the procedure was to obtain VPAP machines for inmates was. Responses from the interviewed staff varied. Every staff member reported that inmates are to have their family bring them in. RN [redacted] stated that a staff member from medical records assists. She stated that [redacted] helps us get them when the family does not bring them in". [redacted] The Medical Review Board finds that Armor Inc. failed to have an adequate procedure to assure that patients who require assisted breathing devices are properly provided with them.

17. [redacted]

18. [redacted]

19. [redacted] The Medical Review Board finds the albuterol nebulizer treatment was administered without a written or verbal physician order. This a violation of Minimum Standard §7010.2(e) and a violation of NYS Education Law Article139 Nursing §6902. Additionally, the Medical Review Board finds that the lack of a documented medical provider examination for a patient with complaints of abdominal pain and shortness of breath with dizziness is evidence of substandard medical care.

20. [redacted]

[redacted] Additionally, the Medical Review Board finds that Armor Inc.'s infirmary admission procedure was deficient as it failed to include any screening for deep vein thrombosis.

21. [redacted] The Medical Review Board finds that there is no evidence that Dr. [redacted] ever physically assessed Cullum and failed to recognize changes in his physical condition including tachycardia, "hard breathing" and a need for possible further albuterol treatments. Cullum was transferred to B3 Cell 19 at 12:00 p.m.

22. [redacted] The Medical Review Board finds this a violation of Minimum Standard §7010.2(e) and a violation of NYS Education Law Article 139 Nursing §6902. Additionally, the Medical Review Board finds that Dr. [redacted] failed to properly recognize the emergent signs of Cullum's hypotension and order the appropriate intervention of an immediate transfer to a hospital.

23. [redacted]

[redacted]

24. [redacted] The Medical Review Board finds that Armor Inc. staff failed to provide [redacted] coverage as ordered by the physician. [redacted] The Medical Review Board finds that there was a continued pattern of substandard medical care wherein Dr. [redacted] failed to examine Cullum following significant changes in his condition. Additionally, Dr. [redacted] failed to recognize the need to transfer a patient to a higher level of care due to [redacted] and an altered level of consciousness following administration of IV fluids. The Medical Review Board opines that this is demonstrative of gross incompetence by Dr. [redacted] and is further evidence of Armor Inc.'s inability to provide competent medical care.

25. [redacted] The Medical Review Board finds that Armor staff failed to follow guidelines of detoxification protocol in that a health care provider must be notified if the heart rate is greater than 100. There is no evidence that a health care provider was notified.

26. [redacted]

27. [redacted] The Medical Review Board finds that this is evidence of unprofessional conduct by LPN [redacted] due to altering the detoxification protocol without consulting a medical provider.

28. [redacted] The Medical Review Board finds that Armor staff showed a pattern of failure to report missed and/or refused treatments and/or medications to the next level of care.

29. [redacted] The Medical Review Board finds that Armor Inc. staff engaged in a pattern of failing to report Cullum's symptoms of weakness, lethargy, and tachycardia to the charge nurse and to the medical provider.

30. [redacted]

31. [redacted] There is no evidence that a medical provider was ever notified of the assessment as required by the detoxification protocol. The Medical Review Board finds that Armor Inc. failed to follow their own guidelines of detoxification protocol in that staff did not notify a medical provider when Cullum's heart rate was greater than 100.

32. [redacted]

33. [redacted]

34. [redacted] The Medical Review Board finds that there was an unacceptable delay of four hours and 40 minutes before Cullum received an assessment by the physician despite being a patient with unstable vital signs. Additionally, the Medical Review Board finds that again medical staff of Armor Inc. failed to identify the emergent signs of Cullum's [redacted] and failed to initiate an emergency transfer to a hospital in a timely manner.

35. [redacted]

36. [redacted]

[redacted]

37. [redacted]

38. [redacted]

39. As of January 2017, Dr. [redacted] is no longer the medical director at the Nassau County Correctional Center.

ACTIONS REQUIRED:

TO THE PRESIDING OFFICER NASSAU COUNTY LEGISLATURE:

1. The Nassau County Legislature shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's pattern of failing to properly manage patient's chronic and acute medical needs.

2. Nassau County should establish a medical contract monitor position for any future medical contractors to assure that adherence to the medical needs of inmates at the correctional facility is met in accordance with standards set forth in the contract for services. Failure of a contractor to maintain within set performance standards should subject the contractor to penalties established by the county.

TO THE JAIL PHYSICIAN OF THE NASSAU COUNTY CORRECTIONAL CENTER:

The practice of utilizing Licensed Practical Nurses for primary nursing services on

infirmary level care of patients in the facility must cease immediately. A Registered Nurse must be assigned as the primary nursing care provider for all infirmary level patients at all times and must remain assigned to said unit when patients are admitted to the infirmary.

TO THE CHIEF EXECUTIVE OFFICER OF ARMOR INC.:

Armor Inc. shall conduct a quality assurance review of the medical care provided to Cullum during his incarceration and the conduct of all staff involved. Said review shall focus on:

- Why adequate care was not provided for reported chronic diseases of [redacted] This must include why [redacted] coverage was not given as ordered, why no assessment and treatment for his [redacted] was provided, and why a [redacted] apparatus was not obtained.
- Why refusals of care/treatment were not routinely reported to the next level of care and documented by health care staff.
- Why health care staff failed to respond to repeated changes in Cullum's vital signs and level of weakness/lethargy.
- Why there was no documentation by the facility health care provider of a physical assessment of a patient with a significant change in vital signs and difficult to arouse when she was made aware. This must include why medical staff did not consider a transfer to a hospital for Cullum after he failed to respond to IV therapy.
- Why there was a gap of greater than four hours between the times Cullum was discovered in his cell and seen by the facility physician to be identified for transfer.
- Why [redacted] treatments were administered on two separate occasions without physician orders.
- Why electronic orders for medications were submitted without the physician's telephone or verbal consent.

TO THE NYS DEPARTMENT OF EDUCATION, OFFICE OF PROFESSIONAL DISCIPLINE:

1. The Medical Review Board requests an investigation be initiated regarding the professional misconduct of Registered Nurses, [redacted] and [redacted] for violating nursing scope of practice by administering medication without an order from a person licensed to provide such orders in New York State.

2. The Medical Review Board requests an investigation be conducted for professional misconduct of Licensed Practical Nurse [redacted] for submission of an electronic prescription for medication without the consent of the physician.

3. The Medical Review Board requests an investigation be conducted for the professional misconduct of LPN [redacted] who altered a detoxification protocol for a patient without consulting or receiving orders from a medical provider.

4. The Medical Review Board requests a comprehensive investigation be conducted into Armor Inc.'s pattern of practice regarding the use Licensed Practical Nurses for primary nursing care in an infirmary setting without the required nursing supervision.

TO THE OFFICE OF PROFESSIONAL MEDICAL CONDUCT:

The Medical Review Board requests that an investigation be conducted into Dr. [redacted] for multiple occasions of gross incompetence including repeated failures to properly identify signs of an unstable patient and order appropriate interventions and hospitalization.

TO THE OFFICE OF THE ATTORNEY GENERAL, HEALTH CARE BUREAU:

The Medical Review Board requests the Attorney General Healthcare Bureau take notice of the enclosed report as part of their review of contracted healthcare providers at local jails in New York State.

WITNESS, HONORABLE THOMAS A. BEILEIN, Chairman, NYS Commission of Correction, Alfred E. Smith State Office Building, 80 South Swan Street, 12th Floor, in the City of Albany, New York 12210 on this 27th day of June, 2017.

Thomas A. Beilein
Chairman

TAB:ET,tlc:
2016-M-0140
06/17

cc: Bruce Teal, Chief Executive Officer
Armor, Inc.
Norma Gonsalves, Presiding Officer
Nassau County Legislature
NYS Attorney General Healthcare Bureau

NEW YORK STATE | Commission of Correction

# Final Report of the New York State Commission of Correction:

## In the Matter of the Death of

## Emanuel McElveen, an inmate of the Nassau County Correctional Center

**June 27, 2017**

**To: Sheriff Michael J. Sposato**
**Nassau County Sheriff's Office**
**100 Carmen Avenue**
**East Meadow, New York**
**11554**


**Thomas A. Beilein**
*Chairman*

**Thomas J. Loughren**
*Commissioner*

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47(1)(d), regarding the death of Emanuel McElveen who died on July 5, 2016 , as a result of circumstances which occurred while an inmate in the custody of the Nassau County Sheriff at the Nassau County Correctional Center, the Commission has determined that the following final report be issued.

FINDINGS:

1. Emanuel McElveen was a 20-year-old black male who died on 7/5/16 of respiratory failure due to [redacted] with large cell lymphoma involving multiple organs while in the custody of the Nassau County Sheriff at the Nassau County Correctional Center (NCCC). The Medical Review Board finds that although McElveen's death was due to a pre-existing medical condition, the failure of Armor Inc. health providers to adequately identify and treat his illnesses, to recognize and treat serious changes in his condition, to provide adequate follow up on refusals and renewals of medication, and a completely inadequate response to his sick call requests were contributory to his worsening health. Despite the investigations of multiple deaths at the Nassau County Correctional Center since 2011, with findings and recommendations from the Medical Review Board regarding systemic deficiencies in the delivery of adequate medical care, there has been a continued failure and unwillingness by Armor Inc. to address the identified issues. Conclusively, the Medical Review Board opines that contracted medical provider, Armor Inc., is incapable of providing competent medical care.

2. McElveen was single and reported no children on admission to the facility. He later stated that he had an infant child. A review of his record did not include any information regarding his childhood or his parents.

3. [redacted]

4. McElveen was admitted to NCCC on 8/21/15 [redacted]

5. [redacted]

[redacted]

6. [redacted]

7. [redacted]

8. [redacted]

9. [redacted]

10. [redacted]

[redacted]

11. [redacted]

12. [redacted]

13. On 11/6/15, McElveen was moved to Protective Custody at his request.

14. [redacted]

15. [redacted] The Medical Review Board finds that Armor Inc.'s response to McElveen's sick call requests, most notably a sick call for chest pain with rapid heart rate, were not responded to timely or adequately.

16. [redacted]

17. [redacted]

18. [redacted]

[redacted]

19. [redacted]

20. [redacted] The Medical Review Board finds there was an unnecessary delay by the medical providers of Armor Inc. in establishing McElveen's [redacted] status as there was a failure to properly respond to his 9/8/15 sick call request for [redacted] testing.

21. [redacted]

22. [redacted]

23. [redacted]

24. [redacted]

25. [redacted]

26. [redacted]

27. [redacted]

28. [redacted]

29. [redacted]

[redacted]

30. [redacted]

31. [redacted]

32. [redacted]

33. [redacted]

34. [redacted]

35. [redacted]

36. [redacted]

[redacted]

37. [redacted] During an interview with Commission staff, nursing staff consistently reported different processes for reporting medication refusal. Medication nurses reported that they filled out the form and placed it in the record, however, they voiced there was no process for reporting the refusals to the RN in charge or the prescriber for follow up. There is no indication that the medical providers were notified.

38. [redacted]

39. [redacted] During an interview with Commission staff, LPN [redacted] stated that renewals were "primarily the med nurse's responsibility". She stated that a copy of the medication administration record should be placed in the medical chart and it would go to the provider. LPN [redacted] stated that the medication nurse usually initiates the renewal directly to the provider. LPN [redacted] stated that he did not know if there was an official system for renewals.

40. [redacted] The Medical Review Board finds that Armor Inc. failed to provide adequate follow up on McElveen's chronic disease and related testing.

41. [redacted] The Medical Review Board finds that there was a pattern of failure by Armor Inc. to establish adequate renewal practices for medications to treat chronic and serious illness and is further evidence of their systemic inability to provide competent medical care.

42. [redacted]

43. [redacted]

44. [redacted]

45. [redacted]

46. [redacted]

47. [redacted] The Medical Review Board finds that there was an inadequate assessment of infectious disease in that the evaluation of the patient's condition was partially based on laboratory testing from two months prior and not based on current values.

48. On 4/4/16, McElveen was placed in D2 for Administrative Segregation in the Behavioral Management Unit (BMU). A contraband sharpened piece of metal was found in the waistband of a pair of shorts in his cell. [redacted]

[redacted] During an interview with Dr. [redacted] he stated that he did not usually receive calls regarding his patients from the jail with abnormal lab tests or acute problems. Laboratory results were "put in the consults" and Dr. [redacted] handled them until they were seen.

49. [redacted] The movement record showed that McElveen was moved out of the BMU on 6/7/16. [redacted]

50. [redacted]

51. [redacted] The Medical Review Board finds that there was a consistent pattern by Armor Inc. of inadequate follow-up on refused and missed doses of ordered medications as evidenced by a lack of refusal forms contained in the record and no documentation by medication nurses that the charge nurse or

prescriber was notified.

52. [redacted]

53. [redacted]

54. On 6/7/16, McElveen was released from the BMU to the B3 unit.

55. [redacted]

56. [redacted] There was no evidence this testing was completed. The Medical Review Board finds that Armor Inc. health care providers failed to recognize McElveen's signs and symptoms of anemia at multiple encounters over a period of eight months until McElveen became unstable, requiring hospitalization and a transfusion. Additionally, the Medical Review Board finds that there was a lack of follow-up of his chronic conditions in that McElveen was never referred to the Chronic Care Clinic for his thyroid condition or anemia. The Medical Review Board finds that medical providers from Armor Inc. failed to properly diagnose and manage an otherwise manageable condition and is further evidence of their inability to provide competent medical care.

57. [redacted] The Medical Review Board finds that there was a consistent pattern of inadequate follow-up of sick call requests. This pattern included a lack of immediate response and assessment by triage nurses to serious complaints such as racing heart, swollen feet, and chest pain resulting in a delay of care for days in some instances. Additionally, there was a pattern of failure by the health care providers to address all topics requested in the sick call request as evidenced by McElveen's first request (9/8/15) for

[redacted] not being fulfilled timely and delaying the detection of his disease. Armor Inc. health care providers also showed a pattern of inadequate assessment of inmate complaints as evidenced by the lack of vital signs on an inmate with complaints of racing heart and chest pain. These patterns of inadequate response to sick call requests resulted in a delayed diagnosis of disease and a need for transport to a higher level of care.

58. [redacted]

59. On 6/28/16 at 7:01 a.m., McElveen filed a grievance. McElveen stated on the form that he has filled out several sick call forms and still has not been seen by medical. McElveen described pain all over his body, loss of hearing, allergic reaction, swollen feet and facial numbness.

60. [redacted]

61. [redacted]

62. [redacted]

[redacted]

63. [redacted]

64. [redacted]

65. [redacted] The Medical Review Board finds that during the course of McElveen's incarceration, Dr. [redacted] failed to provide proper medical supervision, failed to perform thorough medical examinations, and systematically missed required follow up on lab tests and exams on McElveen thus failing to detect his developing lymphoma.

66. [redacted]

67. [redacted]

68. [redacted]

69. [redacted]

70. As of January 2017, Dr. [redacted] is no longer the medical director for Nassau County Correctional Center.

71. [redacted] The Medical Review Board opines that this was caused by a rapid sodium increase, most likely while receiving treatment during his hospitalization.

ACTIONS REQUIRED:

TO THE CHIEF EXECUTIVE OFFICER OF ARMOR INC.:

1. Armor Inc. shall conduct a quality assurance review of the medical care provided to McElveen during his incarceration and the conduct of all staff involved. Said review shall focus on:

   - Why adequate care was not provided for chronic diseases of [redacted] and abnormal thyroid function. This must include why a chronic care clinic was not ordered for thyroid follow up and the [redacted] evaluations were partially based on old laboratory testing.
   - Why refusals of medications were not routinely reported to the next level of care and documented by health care staff.
   - Why providers failed to adequately assess sick call complaints with proper examination and vital signs.
   - Why triage nurses did not immediately assess complaints of rapid heart rate and chest pain.
   - Why nursing staff did not adequately follow up on medication renewals for routine medications.
   - Why a diagnosis of anemia was not detected and treated.

TO THE PRESIDING OFFICER NASSAU COUNTY LEGISLATURE:

1. The Nassau County Legislature shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's pattern of failing to properly manage patient's chronic and acute medical needs.

2. Nassau County should establish a medical contract monitor position for any future medical contractors to assure that adherence to the medical needs of inmates at correctional facility is met in accordance with standards set forth in the contract for services. Failure of a contractor to maintain performance within set performance standards should be subject to penalties established by the county.

3. Nassau County should assure that future medical service providers have access to a credentialed physician specializing in adolescent medicine.

TO THE OFFICE OF THE NYS ATTORNEY GENERAL, HEALTHCARE BUREAU:

The Medical Review Board requests the Attorney General Healthcare Bureau take notice of the enclosed report as part of their review of contracted healthcare providers at local jails in New York State.

WITNESS, HONORABLE THOMAS A. BEILEIN, Chairman, NYS Commission of Correction, Alfred E. Smith State Office Building, 80 South Swan Street, 12th Floor, in the City of Albany, New York 12210 on this 27th day of June, 2017.

Thomas A. Beilein,
Chairman

TAB:ET,tlc:
2016-M-0105
06/17

cc: Bruce Teal, Chief Executive Officer
Armor, Inc.
Norma Gonsalves, Presiding Officer
Nassau County Legislature
NYS Attorney General Healthcare Bureau

NEW YORK STATE | Commission of Correction

# Final Report of the New York State Commission of Correction:

## In the Matter of the Death of

## William Satchell,
## an inmate of the
## Nassau County Correctional Center

June 27, 2017

To: Sheriff Michael J. Sposato
Nassau County Sheriff's Office
100 Carmen Avenue
East Meadow, New York
11554

Thomas A. Beilein
*Chairman*

Thomas J. Loughren
*Commissioner*

80 South Swan Street, 12th Floor, Albany, New York 12210 | 518-485-2346 – phone | 518-485-2467 – fax | www.scoc.ny.gov

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47(1)(d), regarding the death of William Satchell who died on March 24, 2016 , as a result of circumstances which occurred while an inmate in the custody of the Nassau County Sheriff at the Nassau County Correctional Center, the Commission has determined that the following final report be issued.

FINDINGS:

1. William Satchell was a 63-year-old black male who died on 3/24/16 from a cardiac arrest due to an acute pulmonary thromboembolism while hospitalized at the Nassau University Medical Center (NUMC). Satchell was in the custody of the Nassau County Sheriff's Office at the Nassau County Correctional Center (NCCC). The Medical Review Board has found that incompetent healthcare provided to Satchell by the contracted medical provider, Armor Inc., which included repeated failures to recognize life-threatening manifestations of a new onset medical condition and the allowing of Satchell's uncontrolled hyperglycemia to progress to diabetic ketoacidosis, kidney failure, and metabolic compromise, was contributory to his death. The Medical Review Board opines that Satchell's death was preventable if not for the shocking level of inadequate medical care and negligence of the medical staff. Despite the investigations of multiple deaths at the Nassau County Correctional Center since 2011 with findings and recommendations from the Medical Review Board regarding systemic deficiencies in the delivery of adequate medical care, there has been a continued failure and unwillingness by Armor Inc. to address the identified issues. Conclusively, the Medical Review Board opines that contracted medical provider, Armor Inc., is incapable of providing competent medical care.

2. [redacted]

3. Satchell was born in Virginia. He completed eleven years of school. Satchell lived in Hempstead, New York most of his adult life. Satchell was widowed and had a son. He was a retired janitor and received Social Security. There was little personal information available for Satchell. He was survived by his son, brother, and mother. Satchell was living with his brother at the time of his arrest.

4. [redacted]

[redacted]

5. Satchell was arrested by the Village of Hempstead Police on 3/17/16. Satchell was arraigned in Nassau County 1st District Court on 3/17/16 and taken into custody by the Nassau County Sheriff's Office at 7:01 p.m.

6. On 3/17/16 at 7:09 p.m., Officer [redacted] completed the Suicide Prevention Screening Guidelines form on Satchell during the admission process. Satchell answered 'No' to all of the questions. Satchell denied any past or present mental health treatment.

7. On the New Admission Physical Condition Report, Satchell reported that he had "high blood pressure" and that he took medication for it. Satchell reported that he had no injuries. The booking officer, CO [redacted] made a non-emergent referral for medical and mental health. Satchell was to be housed under routine supervision. Satchell was classified as a Max A inmate and was housed in B2- A17.

8. [redacted]

9. [redacted] Health Assessments are completed by an RN and reviewed and signed by a medical provider, which is the standard practice at the Nassau County Correctional Center.

10. [redacted]

11. [redacted]

[redacted] The Medical Review Board finds that there was a definite medication error that occurred with Satchell that went unrecognized by the medical staff. Additionally, the Medical Review Board finds that the medication error and subsequent failures to properly document and address the error are demonstrative of the consistent and systemically incompetent medical care provided by Armor Inc.

12. [redacted]

13. [redacted]

14. [redacted]

15. [redacted]

16. [redacted]

17. [redacted]

18. [redacted]

19. [redacted]

20. [redacted]

21. [redacted]

22. The Medical Review Board finds the response to Satchell's medical emergency by all involved Armor Inc. staff was a collective example of incompetent care. Initially, nursing staff failed to recognize a critically unstable hyperglycemic patient that needed immediate assessment by a physician, immediate medical intervention, and transfer to a hospital. A documented assessment and orders for treatment did not occur for an inexplicable period of over three hours. Additionally, the Medical Review Board finds that FNP [redacted] failed to perform an adequate physical exam on Satchell and failed to have him appropriately transferred to a hospital when seen at 12:45 p.m. The decision to move Satchell into an infirmary bed, whereby he would not be re-assessed by any medical staff until over two hours later is, in the Medical Review Board's opinion, a deliberate indifference to a patient's serious medical needs.

23. The Medical Review Board also finds that the medication error that occurred on 3/18/17 was contributory to Satchell's development of acute hyperglycemia. Although Satchell may have been developing a diabetic condition prior to his incarceration, the errant administration of Olanzapine, an atypical antipsychotic with a known high association of increasing patient's blood glucose resulting in hyperglycemia, was a plausible catalyst to the acute onset of his unstable condition.

24. [redacted] Per Armor Correctional Health Services, Inc. Infirmary Care Policy J-G-03; a Level 1 is assigned for patients requiring comprehensive or complex care; expected to extend beyond 48 hours. It requires clinician notes each day with vital signs and nursing notes completed every eight hours. [redacted]

25. The Armor Insulin Sliding Scale Protocol states that: Insulin sliding scales are to be developed individually for each patient requiring coverage and provided only if ordered. A "standard" sliding scale utilizing Regular Insulin can be ordered. The parameters of the standard sliding scale are:

| | | | |
|---|---|---|---|
| 151 – 200 mg/dl | 2 units | Regular insulin, | subcutaneous |
| 201 – 250 mg/dl | 4 units | Regular insulin, | subcutaneous |
| 251 – 300 mg/dl | 6 units | Regular insulin, | subcutaneous |
| 301 – 350 mg/dl | 8 units | Regular insulin, | subcutaneous |
| 351 – 400 mg/dl | 10 units | Regular insulin, | subcutaneous |
| 401 – 450 mg/dl | 12 units | Regular insulin, | subcutaneous |

450 mg/dl Notify healthcare provider

[redacted] The Medical Review Board finds that medical staff from Armor Inc. failed to conduct a competent physical exam during the admission process by failing to visualize a full skin assessment on Satchell. The Medical Review Board finds that the treatment ordered, a onetime dose of Diflucan 150 mg, was

grossly inadequate. Additionally, the Medical Review Board finds that the addition of Metformin 500 mg bid was an inappropriate measure by FNP [redacted] due to Satchell receiving insulin therapy.

26. FNP [redacted] failed to complete the frequency of vital signs on the Infirmary Admission order sheet, which is in violation of Armor Correctional Health Services, Inc. Infirmary Care Policy J-G-03 for a Level 1 Patient. NP [redacted] is no longer employed by Armor Health Care. The Medical Review Board finds that the failure of FNP [redacted] to properly follow Armor Inc.'s own policy and procedure is further evidence that Armor Inc. is unfit as a whole to be a medical services provider.

27. [redacted]

28. [redacted]

29. [redacted]

30. [redacted]

31. [redacted]

32. [redacted] The Medical Review Board finds that Satchell's hypertension was grossly mismanaged by medical staff from Armor Inc.

33. [redacted]

34. [redacted]

35. [redacted] During an interview with Commission staff, Facility Medical Director, Dr. [redacted] stated that a provider makes daily rounds in the infirmary.

36. [redacted] The Medical Review Board finds that Armor Inc. is in violation of their Infirmary Care Policy for a Level 1 patient in that there was no nursing progress note, completion of the nursing flow sheet, nor vital signs completed by LPN [redacted] for the afternoon/evening shift. Additionally, there was no nursing documentation regarding Satchell's condition by the overnight nurse from 3/22/16 to 3/23/16. The last nursing progress note was completed on 3/22/16 at 11:00 a.m. There was no documentation in Satchell's Infirmary Record that an RN made rounds or was made aware of Satchell's medical condition during that 24-hour period. LPN nursing staff are assigned to the delivery of patient care of infirmary inmates at the Nassau County Correctional Center. According to the Armor Correctional Health Services, Inc., the Job Description of an LPN states that: the LPN reports to the Charge Nurse/Director of Nursing. The LPN is to provide holistic nursing care to a patient in a correctional setting.

<u>The essential functions of the LPN are:</u>

1.) Assist health care providers, registered nurses and allied health professionals with examinations, treatments special tests and routine procedures.

2.) Obtains patient health history, laboratory specimens, vital signs, and administer TB skin tests.

3.) Conducts lab tests and ensures the results are delivered to the correct physician or registered nurse.

4.) Ensures patient is receiving proper care for injury or condition.

5.) Reviews the patient chart; records and reports observed symptoms, reactions, treatments, and changes in patient's condition.

The Medical Review Board finds that Armor Inc. failed to provide adequate supervision and clinical oversight of medical care in their infirmary. Additionally, the Medical Review Board finds that Armor Inc. has engaged in an improper practice by utilizing Licensed Practical Nurses, who lack the qualification and training, for attending to the critical infirmary level care patients without the required level of nursing supervision. The lack of any documented RN assessments or review of Satchell's care during his infirmary admission is evidence that the required presence of a Registered Nurse to be immediately available on the unit that the LPN's are performing their duties is not being met and is in violation of NYS Department of Education Practice Rules for Nursing.

37. [redacted]

38. [redacted]

39. [redacted] The Medical Review Board finds that Dr. [redacted] failed to recognize that Satchell was progressing into acute renal failure and failed to initiate appropriate intervention and transfer to a hospital. Additionally, Dr. [redacted] failed to initiate a referral to Endocrinology on a newly diagnosed diabetes patient. As of January 2017, Dr.

[redacted] is no longer the medical director at the Nassau County Correctional Center.

40. [redacted]

41. [redacted]

42. At 10:47 a.m., a 911 call was made requesting an ambulance to the facility. The Nassau County Police Emergency Ambulance service arrived at the Trauma Room at 10:52 a.m. The Medical Review Board finds that the nursing staff failed to recognize a critically unstable hypotensive patient that needed immediate intervention and failed to activate emergency transfer to a hospital until over 30 minutes later.

43. [redacted] The Medical Review Board opines that the irresponsible delay by Armor Inc. medical staff in obtaining an immediate transfer of Satchell, who had an acute but manageable condition, to a hospital facility was contributory to his death.

44. [redacted]

45. [redacted]

46. [redacted]

47. [redacted]

ACTIONS REQUIRED:

TO THE PRESIDING OFFICER NASSAU COUNTY LEGISLATURE:

1. The Nassau County Legislature shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's pattern of failing to properly manage patient's chronic and acute medical needs.

2. Nassau County should establish a medical contract monitor position for any future medical contractors to assure that adherence to the medical needs of inmates at a correctional facility is met in accordance with standards set forth in the contract for services. Failure of a contractor to maintain performance within set performance standards should subject the contractor to penalties established by the county.

3. Nassau County should appoint an independent medical authority to conduct of thorough review of the health services at the Nassau County Correctional Center and provide oversight the medical care.

TO THE JAIL PHYSICIAN FOR THE NASSAU COUNTY CORRECTIONAL CENTER:

The practice of utilizing Licensed Practical Nurses for primary nursing services on infirmary level care of patients in the facility must cease immediately. A Registered Nurse must be assigned as the primary nursing care provider for all infirmary level patients at all times and must remain assigned to said unit when patients are admitted to the infirmary.

TO THE OFFICE OF THE NYS ATTORNEY GENERAL, HEALTHCARE BUREAU:

The Medical Review Board requests the Attorney General Healthcare Bureau take notice of the enclosed report as part of their review of contracted healthcare providers at local jails in New York State.

TO THE DEPARTMENT OF EDUCATION, OFFICE OF PROFESSIONAL DISCIPLINE:

1. The Medical Review Board requests that an investigation be conducted into the professional misconduct of Family Nurse Practitioner [redacted] multiple occasions of gross incompetence including failing to assess a patient and failing to follow agency treatment protocols.

2. The Medical Review Board requests a comprehensive investigation be conducted into Armor Inc.'s pattern of practice regarding the use Licensed Practical Nurses for primary nursing care in an infirmary setting without the required nursing supervision.

TO THE OFFICE OF PROFESSIONAL MEDICAL CONDUCT:

The Medical Review Board requests that an investigation be conducted into the professional misconduct of Dr [redacted] for multiple occasions of gross incompetence including failure to address a medication error that impacted a patient's health and failure to adequately assess and manage an unstable patient.

WITNESS, HONORABLE THOMAS A. BEILEIN, Chairman, NYS Commission of Correction, Alfred E. Smith State Office Building, 80 South Swan Street, 12th Floor, in the City of Albany, New York 12210 on this 27th day of June, 2017.

Thomas A. Beilein
Chairman

TAB:RG,tlc:
2016-M-0040
06/17

cc: Bruce Teal, Chief Executive Officer
Armor, Inc.
Norma Gonsalves, Presiding Officer
Nassau County Legislature
NYS Attorney General Healthcare Bureau

NEW YORK STATE COMMISSION OF CORRECTION

-----------------------------------

| | | |
|---|---|---|
| In the Matter of the Death | : | FINAL REPORT OF THE NEW YORK STATE COMMISSION OF CORRECTION |
| of John Gleeson, an inmate of the Nassau County Correctional Center | : | |

-----------------------------------

TO: Sheriff Michael J. Sposato
Nassau County Sheriff's Office
100 Carman Avenue
East Meadow, New York 11554

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47(1)(d), regarding the death of John Gleeson who died on July 14, 2014, as a result of circumstances which occurred while an inmate in the custody of the Nassau County Sheriff at the Nassau County Correction Center, the Commission has determined that the following final report be issued.

FINDINGS:

1. John Gleeson was a 40-year-old white male, who died 7/14/14, at 11:20 p.m., while in custody of the Nassau County Sheriff at Nassau County Correctional Center. Gleeson died from cardiorespiratory arrest due to laryngeal edema and angioedema. Gleeson had a history of Hereditary Angioedema that went unrecognized, misdiagnosed, and improperly treated by the medical providers from Armor Inc. The Medical Review Board has found that Armor Inc.'s delivery of healthcare in this matter was incompetent and deficient due to a lack of adequate protocol, lack of coordination, lack of effective communication, and deficient medical knowledge by the physicians and midlevel clinicians. This was compounded by a healthcare record that was unorganized, incomplete, and in selected sections illegible. The Medical Review Board finds that Amor Inc., in its contracted locations in New York State, has engaged in a pattern of inadequate and neglectful medical care and questions their ability to meet and provide for the healthcare needs of jail inmates. Had John Gleeson been provided with competent medical care by Armor Inc. in a timely manner, been properly referred to a specialist, received a correct diagnosis, and received proper medical treatment, his death may have been prevented.

2. Gleeson was born in New York State and grew up in Oceanside. He lived with his parents in Oceanside at the time of his arrest. He is survived by a sister and two children. He was single. Gleeson was a high school graduate with some college. He stated he was an electrician, but no employer was given.

3. Gleeson was arrested on 5/29/14, at 12:00 a.m. and was admitted to the Nassau County Correctional Center at 4:47 p.m. [redacted] He was processed, [redacted] and housed in the infirmary.

4. [redacted]

5. On 6/4/14, Gleeson was moved from the core building to a DWI program housing area in the North Complex and placed in E01-C Block, cell 9. [redacted]

6. [redacted]

7. [redacted] The multiple healthcare providers documenting inconsistently and unidentifiably on multiple forms is representative of an uncoordinated patient health record system.

8. [redacted]

9. [redacted]

10. [redacted]

11. [redacted]

12. [redacted] This represents an uncoordinated healthcare process in obtaining community provider records. [redacted]

13. [redacted]

The Medical Review Board finds that the medical providers of Armor Inc. at the NCCC lacked the clinical knowledge to recognize that Gleeson was symptomatic

of Hereditary Angioedema and continued him on an ineffective course of treatment [redacted] Hereditary Angioedema will not respond to therapy including steroids and antihistamines and must be managed with bradykinin B2 receptor blocking agents such as icatibant. Additionally, the medical providers of Amor Inc. failed to recognize multiple trigger mechanisms for attacks of angioedema including administration of calcium channel blockers, non-steroidal anti-inflammatory drugs, and aspirin. [redacted] Had Gleeson been appropriately referred to a specialist, received a correct diagnosis, and received the proper treatment, his terminal event may have been prevented.

14. [redacted]

15. [redacted]

16. On 7/14/14, Gleeson left his housing unit at 7:45 a.m. to go to Nassau County Supreme Court with seven other inmates. He remained under supervision of Nassau County Sherriff's during his court appearance. His final charges remained as Burglary 3rd degree, class D Felony, and he was returned to the jail.

17. At 3:00 p.m., Gleeson went to medical on his own via an inmate *"pass."* Officer [redacted] assigned to the medical desk, stated he sat near Gleeson while he waited to be seen. He stated Gleeson was pleasant and could speak clearly. [redacted] The medical providers of Amor Inc. again failed to recognize the clinical marker for Hereditary Angioedema (low C1 Esterase) and lacked the medical knowledge that the treatment provided [redacted] would be ineffective. Had Gleeson been transferred to a hospital emergency room and attended to by a board certified physician in emergency medicine a proper diagnosis and treatment could have been obtained. Gleeson was returned to his housing unit at 3:45 p.m. His condition was listed on the form as *"fair"* and he was to follow up *"as needed"*.

18. [redacted] At 9:25 p.m., Gleeson returned to his unit in "fair" condition. The unresolved symptoms [redacted] should have prompted an immediate exam by a physician and for medical staff to consider immediate transfer of Gleeson to a hospital for emergency care. The Medical Review Board finds this is demonstrative of negligent medical care by Armor Inc.

19. At approximately 10:16 p.m., Officer [redacted] responded to a medical emergency reported on the E01 –C/D Unit. He responded to the front gate of the unit where he was met by Gleeson. [redacted] asked Gleeson if he needed a wheel chair but Gleeson declined. Gleeson walked to the medical office *"slowly but steady"* per Officer [redacted] When asked by Commission staff how he looked, Officer [redacted] answered, *"His head was all swollen and blue"*. Gleeson was immediately taken into an exam room and evaluated by RN [redacted] and Dr. [redacted]

20. [redacted]

21. At 10:40 p.m., the Nassau County Police Ambulance arrived.

22. [redacted]

23. Gleeson was transported to Nassau University Medical Center (NUMC) at 10:56 p.m.

24. [redacted]

25. [redacted]

26. [redacted]

RECOMMENDATIONS:

TO THE CHIEF EXECUTIVE OFFICER OF ARMOR INC.:

1. Armor Inc. shall establish an organized and uniform health record for inmate health and mental health care. A review shall be conducted to assure forms are completed thoroughly, signed, dated and legible. All forms must be filed by date in clearly labeled sections and secured to the record. Armor Inc. shall assure a consistent format for all inmate records is adhered to in order for adequate review by providers in order to deliver accurate care.

2. Armor Inc. will review the health care delivery system with consideration of a system that identifies a single case manager for each inmate's care. The provider will manage chronic conditions and follow up on acute conditions seen by other providers. This system will provide more consistent care compared to several providers seeing an inmate. This system will minimize potential errors and gaps in health care such as those that occurred in this case. If the facility does not have adequate physician coverage, the use of RN case managers may also be considered.

3. Armor Inc. shall conduct a quality assurance review of the medical care provided to Gleeson during his incarceration. Said review shall focus on:

   - Why a referral to a specialist (rheumatology) was not expedited for Gleeson whose condition was undiagnosed and refractory to the medications provided?

- Why medical providers failed to diagnose Gleeson with Hereditary Angioedema, failed to recognize that that prescribed medications would be ineffective, failed to obtain an accurate C1 Esterase reading, failed to initiate treatment with icatibant, and failed to recognize current medications may actually be trigger mechanisms?

- Why Gleeson was not examined by a physician at his second emergent sick call on the date of the terminal event or sent immediately to a hospital emergency room?

- Why medical staff did not consider an immediate transfer to a hospital for Gleeson after repeated complaints of edema that were refractory to medical treatment(s) provided?

TO THE PRESIDING OFFICER NASSAU COUNTY LEGISLATURE:

The Nassau County Legislature shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's pattern of failing to properly manage patients chronic medical needs, failing to maintain proper and organized patient records, and failing to provide hospitalization for patients when clinically indicated.

WITNESS, HONORABLE PHYLLIS HARRISON-ROSS, M.D., Commissioner, NYS Commission of Correction, Alfred E. Smith State Office Building, 80 South Swan Street, 12th Floor, in the City of Albany, New York 12210 this 15th day of September, 2015.

Phyllis Harrison-Ross, M.D.
Commissioner

PHR:ET:ams
14-M-96
9/15

Cc: Bruce A. Teal, Chief Executive Officer, Armor, Inc.
Karen Davis, Regional Vice President, Armor, Inc.
Norma L. Gonsalves, Presiding Officer
Nassau County Legislature

NEW YORK STATE COMMISSION OF CORRECTION

| | | |
|---|---|---|
| In the Matter of the Death<br><br>of Kevin Brown, an inmate of<br>the Nassau County Correctional Center | :<br>:<br>:<br>:<br>: | FINAL REPORT OF THE<br>NEW YORK STATE COMMISSION<br>OF CORRECTION |

TO: Sheriff Michael J. Sposato
Nassau County Sheriff's Office
100 Carman Avenue
East Meadow, New York 11554

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47(1)(d), regarding the death of Kevin Brown who died on February 10, 2014, as a result of circumstances which occurred while an inmate in the custody of the Nassau County Sheriff at the Nassau County Correctional Center, the Commission has determined that the following final report be issued.

FINDINGS:

1. Kevin Brown was a 47-year-old male who died on 2/10/14, of cardiac failure due to hypertensive cardiovascular disease while in custody of the Nassau County Sheriff at the Nassau County Correctional Center (NCCC). Brown entered the jail with known histories of traumatic brain injury, seizures, hypertension, and mental health diagnoses. Medical and mental health care provided to Brown at NCCC by Amor Inc., was deficient resulting in a mismanaged mental health diagnosis, inadequate psychiatric care in response to deteriorating behavior, undiagnosed or managed hypertensive cardiovascular disease, and inadequate medical management of a seizure disorder. This was compounded by a health record that was unorganized, incomplete, and in selected sections, illegible. The Medical Review Board finds that Amor Inc., in its contracted locations in New York State, has engaged in a pattern of inadequate and neglectful medical care and questions their ability to meet and provide for the healthcare needs of jail inmates. Additionally, Brown was found at the terminal event in full rigor mortis indicating that proper supervision in accordance with NYS Minimum Standards was not maintained. The Medical Review Board opines that had Brown received proper medical care and supervision, his death may have been prevented.

2. Brown was born in New York State. He was single with no children and his mother was listed as his only relative. He was unemployed. He reported occasional marijuana and alcohol use. Much of his history is unclear as Brown was not cooperative during his intake. He never gave information regarding his family history or education.

3. Brown was arrested by the Nassau County Police Department on 1/13/14 for Pettit Larceny. The police department took him to Nassau University Medical Center prior to admission to the correctional center because he appeared to be under the influence of a substance. Brown was deemed physically fit for confinement.

4. [redacted]

5. Brown was taken to the Nassau County Correctional Center and admitted at 8:36 p.m. on 1/14/14. Brown appeared to be responding to hallucinations during his intake medical and mental health evaluations. He was returned to Nassau University Medical Center for further assessment. Brown was deemed psychiatrically fit for confinement and returned to the Correctional Center.

6. [redacted]

7. [redacted]

8. [redacted]

9. [redacted] There was no formal referral form that described why the referral was made or documenting any of the clinical indicators. Per Commission's interview with mental health staff during the investigation, the record was to be reviewed by the psychiatric provider to ascertain the reason for referral. The Medical Review Board finds this to be a wholly inadequate system for assuring a proper referral is made to a psychiatric provider.

10. At 11:15 p.m. on 1/14/14, Brown was escorted to his cell [redacted] Brown's supervision records show he slept in intervals through the night. It is also documented that inmate needed several verbal cues to understand directions.

11. Per the supervision log, Dr. [redacted] came on post at 9:32 a.m. on 1/15/14. He was off post at 9:45 a.m. [redacted]

12. [redacted]

13. [redacted]

14. [redacted] The Medical Review Boards finds that the lack of a physician assessment and consideration for transfer to a hospital on a patient experiencing a medical emergency such as a seizure is evident of negligent medical care.

15. [redacted]

16. [redacted]

17. [redacted]

18. [redacted]

19. [redacted]

20. [redacted]

21. [redacted]

22. [redacted]

23. [redacted] Dr. [redacted] was no longer employed by Amor Inc. at the time of the Commission's investigation. Brown remained cleared for general population.

24. [redacted]

25. On 1/23/14, Brown moved to a [redacted] on E01-F Block [redacted]

26. [redacted]

27. [redacted]

28. [redacted]

29. [redacted]

30. At 7:30 a.m., on 1/28/14, corrections staff requested mental health to assess Brown again after being found standing naked in his cell covered with white powder. When asked what he was doing Brown replied, *"Can't you see I just got out of the shower, Stupid."* Brown had no shower in his cell and had not yet been out to shower. [redacted]

31. [redacted]

32. [redacted]

33. On 2/2/14, at 9:35 a.m., Brown was released from his cell to get medications, and he walked directly to the shower. He was noted to be covered with urine and feces. He began showering with his clothes on. He then became violent throwing bars of soap at corrections staff and the nurse. Corrections staff utilized Oleoresin Capsicum (OC) spray and the restraint chair to control Brown. [redacted]

[redacted]

34. [redacted]

35. [redacted] The Medical Review Board finds that the psychiatric care provided to Brown by Armor Inc. was inadequate. Despite having evidence of active hallucinations at admission and increasingly agitated behavior, Brown never was provided with a full psychiatric assessment with appropriate diagnosis.

36. On 2/4/14, constant watch documents showed Brown's only unusual behavior was flushing the toilet repeatedly. [redacted]

37. [redacted]

38. During the investigation interview by Commission staff, Clinical Coordinator [redacted] stated that there are *"informal and formal meetings"* to communicate inmate issues. He stated that he *"usually meets one to one"* with his staff. He stated that he communicates with the psychiatrist *"if an inmate has an issue."* There is no documentation showing any discussion took place regarding Mr. Brown.

39. [redacted]

40. [redacted]

41. [redacted] The Medical Review Board finds that medical management of Brown's seizure disorder by Armor Inc. was grossly inadequate and failed to properly address his continued non-compliance with medication and sub-therapeutic levels, an issue that has substantial health risks. The Medical Review Board also finds that changing Brown's seizure medical management without requisite lab values and absent any physical assessment is improper medical practice.

42. [redacted]

43. [redacted]

44. [redacted]

45. The night tour on 2/10/14, was reported to be without any unusual activity by Correction Officers [redacted] and [redacted] When interviewed by Commission staff, [redacted] who was assigned to the supervision of the unit, stated he did rounds every 15 minutes utilizing a flashlight or lantern. According to a review of the security time recording system, rounds were made timely on the unit by Officer [redacted] Officer [redacted] was on a 1:1 constant watch at cell 10 and remained in the area the entire shift.

46. The first four cells on B3D, at the time of terminal event, had plexi glass plates that were on both sets of bars between the walk way and Brown. Officers consistently reported during interviews with Commission staff that the plexi glass was scratched and difficult to see through.

47. At 6:15a.m., Brown did not rise for a standing count conducted by Corporal [redacted] The corporal continued rounds and returned to Brown's cell at 6:20 a.m. Corporal [redacted] attempted to wake Brown but was unsuccessful. The supervisor was notified. Following the arrival of Sergeant [redacted] the cell was opened and Brown was found face down, unresponsive and rigid. Medical staff were notified.

48. [redacted]

49. Upon his discovery at 6:20 a.m., Brown was found with obvious advanced signs of death including the body being in full rigor mortis. This indicates death in excess of four hours when he was discovered. This is in violation of 9 NYCRR §7003.2 (a)(1)(2) which states:

> (1) *"a personal visual observation of each individual prisoner by facility staff responsible for the care and custody of such prisoners to monitor their presence and proper conduct;"* and
>
> *(2) "a personal visual inspection of each occupied individual prisoner housing unit and the area immediately surrounding such housing unit by facility staff responsible for the care and custody of prisoners to ensure the safety, security and good order of the facility."*

50. Local Emergency Medical Services arrived on scene and pronounced Brown dead at 6:55 a.m.

RECOMMENDATIONS:

TO THE CHIEF EXECUTIVE OFFICER OF ARMOR INC.:

1. Armor Inc. shall establish an organized and uniform health record for inmate health and mental health care documentation. Forms must be completed thoroughly, signed, dated and legible. Forms must be filed by date in clearly labeled sections. All forms must be secured to the record. A consistent format for all inmate records must be adhered to in order for adequate review by providers in order to deliver accurate care.

2. Armor Inc. shall conduct a detailed quality assurance review regarding the medical care provided to Kevin Brown with a focus on the following:

   - Why community provider records were not actively sought after by medical staff [redacted]

- Why Brown's continued non-compliance with medication [redacted] were not more aggressively addressed by providers including any consideration of using liquid medication to achieve compliance?

- Why a provider changed Brown's level of [redacted] without requisite lab values or proper assessment?

- Why Brown was not assessed by a physician and transported to a hospital after having two episodes of seizures on 1/15/14?

- Why a baseline neurologic diagnostic workup was not ordered by the physician for Brown, a patient with a known history of traumatic brain injury and had active seizures?

The results of this review shall be forwarded to the Medical Review Board in response to the Preliminary Report.

3. Armor Inc. shall conduct a detailed quality assurance review regarding the mental health care provided to Kevin Brown with a focus on the following:

   - Why Brown did not receive a full psychiatric assessment despite multiple referrals from clinical staff indicating such was needed?

   - Why Brown's overtly psychotic, disoriented, and aggressive symptoms, that were progressively deteriorating, were not addressed despite being repeatedly referred for evaluation?

4. Armor Inc. shall develop an effective system of communication between mental health care team providers, psychiatry and other members of the interdisciplinary team. The plan must include a referral form from clinical staff to the psychiatrist indicating specific reason for referral, associated behaviors and requests for complete psychiatric evaluations to confirm a *"Rule out"* diagnosis. These referrals must not be limited to inmates who take medications. The plan must also include routine clinical meetings, and procedures for communication to non-mental health staff regarding recommendations to assist with management of inmates with mental illness.

<u>TO THE OFFICE OF THE NASSAU COUNTY SHERIFF</u>:

1. The Sheriff shall review the policy for supervision of inmates to include that security rounds involve checking for the presence of each inmate under their care and assuring signs of life. In cases where visualization of an inmate is impeded by a physical barrier, the officer must take steps to directly observe the inmate. Failure to do so results in a violation of NYS Commission of Correction Standard 7003.2. Additionally, any situation in which visualization is impeded, should be reported to their supervisor for rectification. This is especially important in high risk areas such as Behavior Management Units, Medical Units and other areas of heightened supervision.

2. The Office of the Nassau County Sheriff should conduct an investigation and disciplinary proceedings of Correction Officer [redacted] who failed to comply with 9 NYCRR §7003.2 (a)(1) by not assuring a personal observation of each individual prisoner was conducted.

TO THE PRESIDING OFFICER NASSAU COUNTY LEGISLATURE:

The Nassau County Legislature shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's pattern of failing to properly manage patients chronic medical needs, failing to maintain proper and organized patient records, and failing to provide hospitalization for patients when clinically indicated.

WITNESS, HONORABLE PHYLLIS HARRISON-ROSS, M.D., Commissioner, NYS Commission of Correction, Alfred E. Smith State Office Building, 80 South Swan Street, 12th Floor, in the City of Albany, New York 12210 this 15th day of September, 2015.

Phyllis Harrison-Ross, M.D.

Phyllis Harrison-Ross, M.D.
Commissioner

PHR:ET:ams
14-M-11
9/15

Cc: Bruce A. Teal, Chief Executive Officer, Armor, Inc.
Karen Davis, Regional Vice President, Armor, Inc.
Norma L. Gonsalves, Presiding Officer
Nassau County Legislature

NEW YORK STATE COMMISSION OF CORRECTION

| | |
|---|---|
| In the Matter of the Death :<br>:<br>of Bartholomew Ryan, an inmate of:<br>the Nassau County Correctional :<br>Center : | FINAL REPORT OF THE<br>NEW YORK STATE COMMISSION<br>OF CORRECTION |

TO: Sheriff Michael Sposato
Nassau County Correctional Center
100 Carman Avenue
East Meadow, NY 11554

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47(1)(d), regarding the death of Bartholomew Ryan who died on February 24, 2012 while an inmate in the custody of the Nassau County Sheriff at the Nassau County Correctional Center, the Commission has determined that the following final report be issued.

FINDINGS:

1. Bartholomew Ryan was a 32 year old white male who died on 2/24/12 from suicidal hanging while in the custody of the Nassau County Sheriff at the Nassau County Correctional Center. Ryan suffered [redacted] for which he received inadequate evaluation and treatment by Armor Correctional Health Care, Inc. (Armor, Inc.), a business corporation holding itself out as a medical care provider.

2. Bartholomew Ryan was born 5/19/79 and resided in Long Island, NY. Ryan had served in the United States Marine Corp from 2003 to 2008 and served in Iraq. [redacted] He worked as a mechanic and resided most recently at his mother's residence.

3. [redacted]

4. In the instant offense, Ryan was arrested on 2/22/12 for DWI-drugs. He was arraigned in Nassau County District Court and remanded to the Nassau County Jail on 2/23/12 with $10,000 bond or $5,000 cash bail. He was next scheduled to appear at court on 3/9/12.

5. Ryan was booked into the Nassau County Correctional Center at 2:23 p.m. by Officer [redacted] Ryan was screened twice for suicide risk using the Suicide Prevention Screening Guidelines, once by uniformed correctional booking staff and once by a Licensed Practical Nurse employed by Armor, Inc. He scored a "1" on the uniformed staff screening for having a prior psychiatric history, and for taking medications. He was referred to see mental health services and sent to be housed in mental observation on constant supervision. [redacted]

[redacted]

6. [redacted]

7. Ryan was housed on B2, A block, cell #2. Ryan was housed in new admission mental health housing. He was not on constant supervision or suicide watch. An officer is continuously posted on A block and rounds are conducted every 15 minutes.

8. [redacted] The Board finds this assessment by Dr. [redacted] to have been inadequate in not properly accounting for and addressing [redacted]

9. [redacted]

10. Officer [redacted] was assigned as the meal relief officer for B2 on 2/24/12 for the 8:00 a.m. to 4:00 p.m. tour. Officer [redacted] took over supervision of A block at 2:45 p.m. Officer [redacted] was assigned as patrol officer for A and B blocks for the 8:00 a.m. to 4:00 p.m. tour. At approximately 3:00 p.m., Officer [redacted] stopped by cell #11 to speak with inmate [redacted] Officer [redacted] was completing a patrol of blocks A and B at approximately 3:02 p.m. and stopped by cell #11 to speak with inmate [redacted] as well.

11. When Officers [redacted] and [redacted] finished speaking to inmate [redacted] they proceeded to the front of the cell block. At cell #2, they observed Ryan hanging from the cell bars by a bed sheet. The officers ran from the tier to notify other officers. Officer [redacted] obtained the lock box keys from Officer [redacted] and opened the tier. Officer [redacted] reported the emergency on his facility radio and then responded as well.

12. Officer [redacted] entered into A block. He was unable to get the cell gate opened due to the way Ryan was positioned. Officer [redacted] called for a 911 cut down tool and Officer [redacted] responded with one. Officer [redacted] cut the sheet away from Ryan's neck and Ryan slid downward. The cell gate would still not open after Ryan was cut down as his arm had fallen in between the cell bars. Officers [redacted] and [redacted] repositioned Ryan through the bars and the gate was then opened. Officer [redacted] entered the block and along with Officers [redacted] and [redacted] removed Ryan from his cell. Ryan was unresponsive and had no breathing or pulse.

13. Officer [redacted] began chest compressions on Ryan while Officer [redacted] and [redacted] worked on establishing an airway and rescue breathing. Officer [redacted] responded with an AED and Officer [redacted] applied it. No shock was advised.

14. [redacted]

15. During the resuscitation, it was found that an ambulance had not been called for. Officer [redacted] called for an ambulance from the East Meadow Fire Department at approximately 3:23 p.m. [redacted]

16. [redacted]

17. In response to this incident, the Nassau County Sheriff directed Correctional Center staff to review policy and procedure CD 06-0404, Public Access Defibrillation, which requires simultaneous activation of EMS and when the AED is deployed.

RECOMMENDATIONS:

TO THE OFFICE OF THE NASSAU COUNTY SHERIFF:

The Office of the Nassau County Sheriff, in accordance with the completed incident review, shall ensure that all staff are familiar and comply with policy and procedure CD 06-0404, Public Access Defibrillation.

TO THE PRESIDENT OF ARMOR, INC.:

1. Armor, Inc. shall conduct a quality improvement training session with all mental health staff on assessing the special mental health needs of combat veterans who are incarcerated.

2. Armor, Inc. shall inquire into and evaluate the professional conduct of [redacted], MD, who performed an inadequate psychiatric assessment of a patient [redacted]

WITNESS, HONORABLE PHYLLIS HARRISON-ROSS, M.D., Commissioner, NYS Commission of Correction, Alfred E. Smith State Office Building, 80 South Swan Street, 12th Floor, in the City of Albany, New York 12210 this 19th day of March, 2013.

Phyllis Harrison-Ross, M.D.
Commissioner

PHR:CO:mj
12-M-21
12/12

cc: Jose Armas, M.D., President, Armor Correctional Health Services, Inc.