UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
GLORIA GAZZOLA, Individually and as
Administrator of the Estate of
ANTONIO MARINACCIO, JR.,

               Plaintiff,

        -against-

COUNTY OF NASSAU; NASSAU COUNTY
CORRECTIONAL CENTER; NASSAU COUNTY
SHERIFF'S DEPARTMENT; MICHAEL J.
SPOSATO, Individually and as
Sheriff of NASSAU COUNTY; ARMOR
CORRECTIONAL HEALTH SERVICES, INC.;
ARMOR CORRECTIONAL HEALTH SERVICES
OF NEW YORK, INC.; NASSAU COUNTY
CORRECTIONS OFFICERS, "JOHN DOES 1-
10," in their Individual and
Official Capacities; ARMOR
CORRECTIONAL HEALTH SERVICE
EMPLOYEES AND AGENTS, "JOHN and JANE
DOES 11-20," in their Individual and
Official Capacities,

              Defendants.
----------------------------------X

MEMORANDUM & ORDER
16-CV-0909(JS)(AYS)

APPEARANCES
For Plaintiff:          Harry Chris Demiris, Esq.
                      400 Post Avenue, Suite L11
                      Westbury, New York  11590

For Defendant
County of Nassau:     Andrew Reginald Scott, Esq.
                      Nassau County Attorney's Office
                      1 West Street
                      Mineola, New York  11501

For Defendant
Armor Health:         Dale Nicholson McLaren, Esq.
                      John J. Doody, Esq.
                      Lewis Brisbois Bisgaard & Smith, LLP
                      77 Water Street, 21st Floor
                      New York, New York  10005

SEYBERT, District Judge:

On February 23, 2016, Gloria Gazzola ("Plaintiff"), individually and as the administrator of the estate of Antonio Marinaccio, Jr., commenced this action pursuant to 42 U.S.C. § 1983 against the County of Nassau (the "County") and Armor Correctional Health Services, Inc.[1] ("Armor," and together with the County, "Defendants"), among other Defendants.   Plaintiff brings <u>Monell</u> claims against Defendants for deliberate indifference to Marinaccio's medical needs in violation of his Eighth Amendment constitutional rights, as well as New York State law claims.   Pending before the Court are Defendants' respective motions for summary judgment.   (County Mot., ECF No. 58; County Support Memo, ECF No. 58-13; County Reply, ECF No. 69; Armor Mot., ECF No. 61; Armor Support Memo, ECF No. 61-12; Armor Reply, ECF No. 70.)   For the following reasons, the County's motion is GRANTED in part and DENIED in part; and Armor's motion is GRANTED in part and DENIED in part.

<u>BACKGROUND</u>

Unless otherwise noted, the following facts are undisputed.[2]

---

[1] Plaintiff also names Armor Correctional Health Services of New York, Inc. as a Defendant.

[2] The parties' respective Local Rule 56.1 Statements are equally unhelpful, Defendants for failing to address facts of obvious relevance to the legal issues raised herein, such as the New York

I.   <u>Facts</u>

This case arises out of the death of Antonio Marinaccio, Jr. ("Decedent") while incarcerated at the Nassau County Correctional Center ("NCCC").  The NCCC is a correctional facility operated by the Nassau County Sheriff's Department, an agency of the County.  Michael Sposato served as the Sheriff of Nassau County during the relevant period.  Sheriff Sposato was therefore responsible for the daily operation of the NCCC.

A.   <u>Pre-Incarceration Medical Examination</u>

From September 19, 2012 up until his incarceration at the NCCC on April 24, 2015, Decedent received treatment from Patricia Dellatto, a nurse practitioner, for pain management after he sustained injuries in a car accident in October 2010.  (Armor

_____

State Commission of Corrections report on the Decedent's (and others') death while in custody at the NCCC; and Plaintiff for failing to support each statement of fact with admissible evidence, as the Local Rules require.  Further, neither Defendant filed a response to Plaintiff's Local Rule 56.1 Counterstatement, as the Local Rules and this Court's Individual Rules require.  Rather than strike the parties' respective Local Rule 56.1 Statements and Counterstatements, the Court has independently reviewed the summary judgment record, including the exhibits attached to the Declarations of Andrew R. Scott (Scott Decl., ECF No. 58-1), Dale McLaren (McLaren Decl., ECF No. 61-2), and Harry C. Demiris, Jr. (Demiris Decl., ECF Nos. 66; Second Demiris Decl., ECF No. 67-2), to identify the facts relevant to disposition of Defendants' respective motions.  <u>See</u> <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court "is not required to consider what the parties fail to point out" in their Local Rule 56.1 statements, it may in its discretion opt to "conduct an assiduous review of the record.").  For that reason, the Court cites sparingly to the parties' Local Rule 56.1 Statements and Counterstatements.

Local Rule 56.1 Statement ("Armor 56.1 Stmt."), ECF No. 61-1, ¶ 15; Nurse Dellatto Depo. Tr. at 23:8-11, Ex. H, attached to McLaren Decl.)  Throughout the course of his treatment, Nurse Dellatto twice performed an electrocardiogram test, or "EKG,"[3] on Decedent: once on January 28, 2013, and again on April 14, 2015.[4]  (Armor 56.1 Stmt. ¶ 16.)  After the first EKG, which showed changes with possible myocardial infarction and "right access deviation," or electrical activity of the heart shifting to the right," Nurse Dellatto referred Decedent to a cardiologist.  (Nurse Dellatto Depo. Tr. at 56:20-57:6; id. 67.)  Nurse Dellatto's medical chart from around this time indicates that Decedent was diagnosed with "coronary artery disease with shortness of breath and nonspecific EKG changes . . . showing first degree block."  (Id. at 69:11-14.)

Nurse Dellatto performed the second EKG on Decedent shortly before his incarceration at the NCCC.  The EKG indicated "nonspecific abnormal electrocardiogram" with an "unconfirmed

---

[3] "An electrocardiogram (ECG) [also known as an "EKG"] is one of the simplest and fastest tests used to evaluate the heart. Electrodes (small, plastic patches that stick to the skin) are placed at certain spots on the chest, arms, and legs.  The electrodes are connected to an ECG machine by lead wires.  The electrical activity of the heart is then measured, interpreted, and printed out.  No electricity is sent into the body." Electrocardiogram, Johns Hopkins Medicine https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electrocardiogram (last visited June 23, 2022).

[4] There is some confusion whether Decedent received more than the two documented EKGs during his course of treatment with Nurse Dellatto.  (See, e.g., Nurse Dellatto Depo. Tr. at 68, 72.)

interpretation." (Id. at 100:1-12.)  Based on the results of the second EKG, as well as her physical examination, Nurse Dellatto did not find any indication that Decedent was suffering from a cardiac problem. (Id. at 100-101.)  Nurse Dellatto believes that she gave Decedent "a copy of the EKG to show to his lawyer, and the jail, and the court." (Id. at 50:6-8.)

B.   Initial Examination at the NCCC

Decedent arrived at the NCCC on April 24, 2015.  At 11:00 p.m. that evening, Armor nurse Katherine McCormack performed an "intake health screening and assessment" on Decedent. (Armor Medical Records at 15, Ex. C, attached to McLaren Decl.)[5]  Nurse McCormack took a complete set of Decedent's vitals and his temperature. (Id.)  According to Nurse McCormack's treatment notes, Decedent reported that for the two weeks leading up to his admission to NCCC he had been suffering from a cough with expectoration of green mucus. (Id. at 22.)  Decedent added that he "went on a binge until jail" and admitted to using cocaine, crack, marijuana, and Percocet.[6] (Id. at 13, 16; see also Nurse McCormack Depo. Tr. at 25, Ex. 9, attached to Second Demiris

---

[5] Citations are to the exhibits' internal pagination where available; otherwise, citations are to the electronically generated pagination.

[6] Nurse Dellatto had invariably prescribed Percocet for Decedent for pain management, and it is unclear from the record whether Decedent's Percocet use prior to his incarceration was physician-approved.

Decl.)[7]   Nurse McCormack observed Decedent was "anxious," "disheveled," and "aggressive."   (Armor Medical Records at 15.)

Based on Decedent's anxious and disheveled state, as well as his "significant past medical history of polysubstance," or use of multiple forms of drugs and alcohol, and the fact that he had an EKG prior to his incarceration, Nurse McCormack asked the supervising doctor, Dr. Sanchez, to order an EKG and a chest X-ray.   (Nurse McCormack Depo. Tr. at 25-26.)   According to Nurse McCormack, after confirming that Decedent did not report any chest pain, Dr. Sanchez declined to order an EKG or chest X-ray.   (Id. at 26-27.)   Nurse McCormack further testified that, at her urging, Dr. Sanchez came into the intake room and spoke to Decedent.   (Id. at 28-29.)   Although she does not recall the specifics, including whether Dr. Sanchez examined Decedent, she recalls some discussion about Decedent's recent EKG.   (Id. 28:24-29:14.)   In the end, Dr. Sanchez ordered an albuterol nebulizer to treat Decedent's asthma but did not order the EKG or chest X-ray.   (Id. at 30.)   Nor did Dr. Sanchez write a progress note summarizing his visit with Decedent.   Moreover, Nurse McCormack claims that the assessment note she created in connection with Decedent's intake examination, wherein she recorded that Dr. Sanchez declined to order an X-ray

---

[7] Plaintiff separately provided an uncorrupted copy of Nurse McCormack's deposition testimony at ECF No. 73.

and EKG, went missing after Decedent's subsequent cardiac incident. (Id. at 39-40.)

The following morning, another Armor nurse examined Decedent. She observed "wheezes present in lungs" and contacted an Armor physician's assistant to order albuterol nebulizer to treat Decedent's asthma.

C. Emergency Medical Treatment

In the early morning hours of April 26, 2015, Decedent complained of chest pains to the NCCC correctional officer on duty in Decedent's cell block. (See Correction Officer Desk Log, Ex. 2, attached to Second Demiris Decl.) The correctional officer, likely Officer Meyer, later told the New York State Commission of Correction ("NYS COC") that Decedent told him "I feel like I am having a heart attack." (NYS COC Report on Decedent at 5, Ex. 7, attached to Second Demiris Decl.) Officer Meyer called Armor for an emergency sick call, and Armor Nurse Benny Cador responded.

In his deposition, Nurse Cador summarized his initial assessment:

> The patient was physically stable, no respiratory distress. He walked up from his bed, he walked to the bars. He was able to -- he was alert, oriented times four, he knew where he was. He was physically stable to walk to the bars. . . . I did a set of vitals, I checked his vitals. He didn't have a fever. He did complain that he . . . felt warm . . . and he felt achy. At first I thought it was like maybe the flu.

(Nurse Cador Depo Tr. at 62:16-63:4, Ex. I, attached to McLaren Decl.; see also Armor Medical Records at 3.)  Nurse Cador does not recall whether Officer Meyer advised him that Decedent was complaining of chest pains.  (Nurse Cador Depo. Tr. at 99:9-11.) The record on this question is unclear.  (See, e.g., NCCC C.O. Stmts. at 5, Ex. 5, attached to Second Demiris Decl. (statement of Correctional Officer Sergeant Thomas Nicholas: "It is to be noted that Inmate Marinaccio was complaining of chest pains to correction staff . . . approximately forty five [sic] minutes prior to him being found unresponsive in his cell."); id. at 37 (contemporaneous notes from unidentified correctional officer regarding encounter with Decedent: "I feel like I'm having a heart attack"; "informed chest pain"); id. at 48 (contemporaneous notes from unidentified correctional officer regarding encounter with Decedent: "Don't recall stated to RN that Marinaccio was having chest pain"); id. at 57 (same: "Inmate c/o chest pains").  In any event, Nurse Cador promised to have a doctor follow up with Decedent in the morning. (Nurse Cador Depo. Tr. at 81:19-24.)

A short time after Nurse Cador's examination,[8] Officer Minter, another NCCC correctional officer, found Decedent

---

[8] The length of the interval between Nurse Cador's initial examination and Decedent's cardiac incident is unclear from the record.  Nurse Cador's treatment notes indicate that his initial examination occurred at 3:25 a.m., and he was called back to Decedent's cell at 3:35 a.m.  (Armor Medical Records at 3.)

unresponsive and lying faceup in his cell.  (Armor 56.1 Stmt. ¶ 7;
NCCC C.O. Stmts. at 18.)  Officer Minter activated his body alarm
and notified Armor that there was an emergency.  (See generally
NCCC C.O. Stmts.)  Nurse Cador was summoned to provide emergency
treatment; however, he forgot the automated external
defibrillator, or "AED," and was forced to return to the nursing
station to retrieve it.  (Nurse Cador Depo. Tr. at 105:21-22.)  In
Nurse Cador's absence, the responding correctional officers
performed CPR on Decedent.  (Id. at 111:13-17.)  Upon his return,
Nurse Cador deployed the AED, and he and the responding
correctional officers continued alternating between the AED and
CPR "until the emergency services got there."  (Id. at 111-17,
119:9-11.)

Emergency medical technicians subsequently arrived at
the scene and took over all life-saving efforts.  (Armor 56.1 Stmt.
¶ 10.)  Decedent was transferred by EMT to Nassau University
Medical Center and then again to North Shore University Hospital,
where he died on May 2, 2015.  (Armor 56.1 Stmt. ¶ 11.)  The
resulting autopsy performed on Decedent attributed his cause of
death to anoxic encephalopathy following cardio-respiratory
arrest, i.e., brain damage following a heart attack.  (Armor 56.`
Stmt. ¶ 13.)

---

However, he testified at his deposition that the interval was
"maybe forty-five minutes."  (Nurse Cador Depo. Tr. at 63:13-14.)

D.    <u>The New York State Commission of Correction Reports</u>

The NYS COC issued a final report on Decedent's death while in custody at the NCCC. (<u>See</u> NYS COC Report on Decedent, <u>attached to</u> Demiris Decl.) Based upon reports from its Medical Review Board, the NYS COC found that Decedent "received inadequate health care from Armor Inc. . . . due to having an unrecognized acute myocardial infarction with probable electrocardiogram changes that could have been detected had he received a proper medical examination." (<u>Id.</u> at 2.) Had Armor recognized the "signs of [Decedent's] myocardial infarction," the Report continued, "his death may have been prevented." (<u>Id.</u>) The Report specifically found that the lack of a written examination note in the progress notes by Dr. Sanchez during his initial assessment of Decedent "represents inadequate documentation" in violation of the NY COC minimum standards and does not provide evidence that an examination occurred, and that Nurse Cador's decision to leave the scene of Decedent's cardiac incident to retrieve the AED constituted abandonment of a patient. (<u>Id.</u> at 3, 6.) The NYS COC made several recommendations to Armor, including that it conduct a detailed quality assurance review regarding the medical care provided to Decedent; and to the County, including that it conduct an inquiry into the fitness of Armor to serve as a correctional medical care

provider at the NCCC.  (Id. at 6-7.)  The NYS COC addressed the Report to Sheriff Sposato.  (Id. at 1.)

Plaintiff submits seven other NYS COC reports regarding inmate deaths at NCCC while under Armor's care during the 2012 through 2016 time period.  (NYS COC Final Reports on Inmate Deaths, Ex. 8, attached to Second Demiris Decl.)  In each report, all of which are addressed to Sheriff Sposato, the NYS COC makes certain findings as to the relevant incident and corresponding recommendations to Armor and the County.  For example, in one report the NYS COC found that the decedent's death "was impacted by a failure of health care providers from Armor Inc. to adequately treat chronic illness, recognize and treat serious changes in [the decedent's] condition, provide adequate follow up on refusals of treatment and to provide a prompt transfer to a higher level of care when indicated." (Id. at 3.)  The NYS COC found these failures amounted to "systemic deficiencies in the delivery of adequate medical care." (Id.)  In another report, the NYS COC found that while the decedent died due to a pre-existing medical condition, "the failure of Armor Inc. health providers to adequately identify and treat [the decedent's] illnesses, to recognize the serious changes in his condition, to provide adequate follow up on refusals and renewals of medication, and a completely inadequate response to his sick call requests were contributory to his worsening health." (Id. at 15; see also id. at 30 (finding Armor's provision

of "incompetent healthcare" contributed to inmate's death); id. at 42 (finding Armor's delivery of healthcare that was "incompetent and deficient" contributed to inmate's death); id. at 50 (similar); id. at 61 (finding inadequate evaluation and treatment by Armor).) The reports consistently recommended that the County conduct an inquiry into the fitness of Armor to provide correctional medical care at NCCC.

     E.    The NCCC's Contract with Armor

       In 2011, after requesting and evaluating proposals from several healthcare providers, the County entered into an agreement with Armor whereby Armor would provide medical, mental health, dental, and ancillary services to inmates incarcerated at Nassau County Correctional Facilities. (County Local Rule 56.1 Statement ("County 56.1 Stmt."), ECF No. 58-14, ¶¶ 10-15.)[9]  Under the contract, Armor agreed to provide services in accordance with the minimum standards of medical service as set forth in the Settlement Agreement between the Department of Justice and the County, which had resulted from a years' long investigation by the DOJ into conditions at the NCCC. (Pl. Local Rule 56.1 CounterStatement to County ("Pl. 56.1 Counterstmt. to County"), ECF No. 67-1, ¶ 48; Settlement Agreement, Ex. 1; Armor Contract, Ex. 5A, attached to Demiris Decl.)

---

[9] The contract was extended through the relevant period in which Decedent was incarcerated at the NCCC.

As relevant here, the contract required Armor to develop
and implement a written "quality improvement program" for medical
and mental health care under the auspices of a Quality Improvement
Committee, or QIC, which was responsible "for all quality
improvement activities" consistent with the provisions of the DOJ
Settlement (Settlement Agreement § 5(a), (b), (c).) The contract
directed that the QIC be chaired by a physician and "include a
multi-disciplinary review necessary to properly review the status
of health care provided to inmates at NCCC." (Id.) The QIC would
meet and report monthly to Sheriff Sposato and to the "Health
Contract Administrator," a County employee designated to oversee
administration of and monitor compliance with the contract. (Id.)
However, since August 2013, the NCCC has been without a Health
Contract Administrator due to the County's failure to designate
one. (County Comptroller Audit at 9, Ex. 3, attached to Demiris
Decl.) Nor did the QIC meet monthly with Sheriff Sposato, as the
contract required. Indeed, Armor did not implement a quality
improvement plan as required. (Pl. 56.1 Counterstmt. to County ¶
158.)

Further, the contract obligated Armor to share costs
with the County for off-site medical services. Specifically, once
the cost of off-site medical services exceeded the $750,000
threshold per annum, Armor became responsible for 60% of the costs,

with the County paying the remaining 40%.  (Pl. 56.1 Counterstmt. to County ¶ 137.)

II.   Procedure

Plaintiff initiated this action on February 23, 2016. Based on the foregoing allegations, Plaintiff asserted federal claims pursuant to Section 1983 for violations of Decedent's Eighth Amendment rights and Monell liability, as well as state law claims for failure to train; failure to supervise; failure to provide adequate medical care; mistakes in medical treatment; deliberate indifference; vicarious liability; negligence; wrongful death; failure to treat and/or diagnose; and intentional infliction of emotion distress.

By order dated October 13, 2016, Judge Spatt[10] dismissed Plaintiff's claims against Sheriff Sposato in his official and individual capacity for failure to adequately plead Sheriff Sposato's personal involvement in the alleged constitutional deprivations, but permitted Plaintiff's Monell claim against the County to proceed.  (Order, ECF No. 20.)  Magistrate Judge Shields certified that the parties completed discovery after they filed their joint pre-trial order ("JPTO," ECF No. 57), and Defendants' respective motions for summary judgment followed.

---

[10] The case was reassigned to the undersigned on June 30, 2020.

14

DISCUSSION

I.   Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wagner v. Chiari & Ilecki, LLP, 973 F.3d 154, 164 (2d Cir. 2020) (quoting Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007)) (internal quotation marks omitted). "The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (cleaned up). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," as Plaintiff does here, "the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Hetchkop v. Woodlawn at Grassmere, Inc.,

116 F.3d 28, 33 (2d Cir. 1997).  Moreover, "the court is not to make assessments of the credibility of witnesses" on a motion for summary judgment, as "[c]redibility assessments, choices between conflicting versions of events, and weighing of the evidence are matters for the jury."  Id.

On a motion for summary judgment the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).  In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).  When drawing inferences from evidence in the record in favor of the non-moving party, however, a court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1318 (2d Cir. 1990)).

II.  Analysis

A.  Section 1983

Section 1983 provides a civil claim for damages against
any person who, acting under color of state law, deprives another
of any rights, privileges, or immunities secured by the
Constitution or the laws of the United States.  See 42 U.S.C.
§ 1983; Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010).  "The
purpose of § 1983 is to deter state actors from using the badge of
their authority to deprive individuals of their federally
guaranteed rights and to provide relief to victims if such
deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992).
Further, it is well established that a municipality such as the
County cannot be held liable under Section 1983 on a respondeat
superior theory.  See Monell v. Dep't of Soc. Servs., 436 U.S.
658, 691 (1978); Roe v. City of Waterbury, 542 F.3d 31, 36 (2d
Cir. 2008).  "Rather, municipalities may be liable [under Section
1983] only where 'execution of a government's policy or custom'
causes constitutional violations."  Buari v. City of New York, No.
18-CV-12299, 2021 WL 1198371, at *21 (S.D.N.Y. Mar. 30, 2021)
(quoting Monell, 436 U.S. at 694).

There are no individually named defendants in this
action, save Sheriff Sposato, who was dismissed as a party in an
earlier order.  Although several "John and Jane Doe" defendants
were named, to date, Plaintiff has not moved to substitute named

17

defendants for these unidentified individuals.  As a result, Plaintiff's claims against these John and Jane Doe defendants are dismissed at this time.  See Asseng v. County of Nassau, No. 14-CV-5275, 2021 WL 596620 at *11 (quoting Delrosario v. City of New York, No. 07-CV-2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) ("Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice.")); Gleeson v. County of Nassau, No. 15-CV-6487, 2019 WL 4754326, at *12 (E.D.N.Y. Sept. 30, 2019) (dismissing the plaintiffs' Section 1983 claims against John and Jane Doe defendants in identical circumstances).

With respect to her federal claims, then, Plaintiff may proceed against the County and Armor only on a theory of Monell liability.  "To prevail against a municipality in a Section 1983 action, a plaintiff must plead and prove three elements: (1) an official policy or custom that (2) caused the plaintiff to be subjected to (3) a denial of a constitutional right."  Kogut v. County of Nassau, No. 06-CV-6695, 2009 WL 5033937 (E.D.N.Y. Dec. 11, 2009) (citing Hartline v. Gallo, 546 F.3d 95, 103 (2d Cir. 2008)).  The Court first assesses whether there remain triable issues as to whether Defendants denied Plaintiff his right to adequate medical care while incarcerated as protected by the Eighth Amendment to the United States Constitution.

18

1.   <u>Deliberate Indifference to Medical Needs</u>

   i.   <u>Applicable Law</u>

The County[11] owes "a constitutional obligation to provide medical care to persons it is punishing by incarceration." <u>Charles v. Orange County</u>, 925 F.3d 73, 82 (2d Cir. 2019) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976)).   "When the state is deliberately indifferent to the medical needs of a person it has taken into custody, it violates the Eighth Amendment's prohibition on cruel and unusual punishment." <u>Id.</u> (citing <u>Estelle</u>, 429 U.S. at 104).

   To establish that a prison official was deliberately indifferent to a prisoner's medical needs in violation of the Eighth Amendment, the plaintiff must show: (1) the alleged deprivation of adequate medical care was "sufficiently serious"; and (2) the prison official acted with "deliberate indifference to inmate health." <u>Salahuddin v. </u>Goord, 467 F.3d 263, 279-80 (2d Cir. 2006) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994)); <u>see also</u> <u>Alvarez v. Wright</u>, 797 F. App'x 576, 579 (2d Cir. 2019); <u>Hill v. Curcione</u>, 657 F.3d 116, 122 (2d Cir. 2011); <u>Johnson v.</u>

---

[11] It is well established that third-party healthcare providers retained by the County to provide medical care at its prisons are state actors for purposes of Section 1983. <u>Ryan v. County of Nassau</u>, No. 12-CV-5343, 2016 WL 11500151, at *7 (E.D.N.Y. Mar. 31, 2016) (Seybert, J.) ("Since Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, the Court finds that it was a state actor that can be sued pursuant to Section 1983." (cleaned up)).

Wright, 412 F.3d 398, 403 (2d Cir. 2005); Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

With respect to the first requirement, often referred to as the "objective test," the court must answer two inquiries. First, the court must determine "whether the prisoner was actually deprived of adequate medical care," because the prison official's duty under the Eighth Amendment "is only to provide reasonable care." Salahuddin, 467 F.3d at 279-280 (citing Farmer, 511 U.S. at 844-47). Second, "the objective test asks whether the inadequacy in medical care is sufficiently serious." Id. at 280. "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" Id. (quoting Chance, 143 F.3d at 702). The "seriousness inquiry" differs where, rather than a failure to provide any medical treatment, the inmate claims that "the inadequacy is in the medical treatment given"; for example, where "the offending conduct is an unreasonable delay or interruption in [on-going] treatment." Id. (citing Smith, 316 F.3d at 185). In the case of delay or interruption in treatment, the focus is on "the severity of the temporary deprivation alleged by the prisoner" and the "particular risk of harm faced by the

prisoner due to the challenged deprivation of care." Smith, 316
F.3d at 186 (citing Chance, 143 F.3d at 702-03); see also Demata
v. N.Y.S. Corr. Dep't of Health Servs., 198 F.3d 233 (2d Cir. 1999)
(holding the plaintiff could not sustain an Eighth Amendment claim
for deliberate indifference to serious medical needs where he could
not demonstrate his injuries degenerated as a result of the alleged
deprivation of treatment); Bilal v. White, 494 F. App'x 143, 146
(2d Cir. 2012) (holding the plaintiff could not sustain an Eighth
Amendment claim for deliberate indifference to serious medical
needs where "there [was] no evidence that [the plaintiff's]
conditions worsened over the hours of delay here").

      With respect to the second, "subjective" or "mens rea,"
requirement, at the summary judgment stage the court must determine
whether a reasonable jury could conclude that the prison official
knew of and disregarded "an excessive risk to inmate health or
safety"; that is, the official was "aware of facts from which the
inference could be drawn that a substantial risk of serious harm
exists, and he must also draw the inference." Farmer, 511 U.S. at
827; see also Salahuddin, 467 F.3d at 280; Hill, 657 F.3d at 122;
Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998).   The
subjective requirement demands the plaintiff show that the charged
official was subjectively aware that his conduct created a
substantial risk of harm to the inmate.  Salahuddin, 467 F.3d at
280-81; Farmer, 511 U.S. at 837 (holding a subjective, rather than

an objective, test for deliberate indifference "comports best with the text of the [Eighth] Amendment," since that Amendment "does not outlaw cruel and unusual 'conditions,' but rather cruel and unusual 'punishments'"). For that reason, "the risk of harm must be substantial and the official's actions more than merely negligent." Id. at 280 (citing Farmer, 511 U.S. at 835-37). "[N]ot every lapse in medical care is a constitutional wrong," id. at 279, and "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Farmer, 511 U.S.at 838; see also Estelle, 429 U.S. at 106 (holding a prisoner must demonstrate more than "an inadvertent failure to provide adequate medical care").

Since it appears from their briefs that the parties fail to recognize it, the Court must point out that "[a] post-conviction-prisoner's deliberate indifference claim is analyzed under the Eighth Amendment while the same claim raised by a pretrial detainee is analyzed under the Due Process Clause of the Fourteenth Amendment." Horace v. Gibbs, 802 F. App'x 11, 13-14 (2d Cir. 2020) (citing Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017)). This distinction is relevant to the present dispute, because the Eighth and Fourteenth Amendments "embrace different definitions of the 'subjective' or 'mens rea prong.'" Id. at 14 (citing Darnell, 849 F.3d at 35). Whereas under the Eighth

22

Amendment, the subjective requirement obligates the plaintiff to show that the defendant official acted or failed to act while actually aware of a substantial risk that serious inmate harm will result, under the Fourteenth Amendment, "an official does not act in a deliberately indifferent manner toward an arrestee unless the official 'acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.'" Id. (quoting Darnell, 849 F.3d at 35) (emphasis omitted); see also Charles, 925 F.3d at 86–87 (holding that while this "formulation of the deliberate indifference standard was developed in cases involving unconstitutional conditions of confinement," the "same principles" apply to claims of unconstitutionally inadequate medical treatment).

      ii.  Application

The Court finds there are triable issues of fact as to Plaintiff's claim that Defendants were deliberately indifferent to Decedent's medical needs. Defendants cannot establish as a matter of law that Decedent's undetected heart condition was not "sufficiently serious" to establish the "objective test." As to the "subjective" or "mens rea" inquiry, genuine disputes of material fact in the summary judgment record preclude a finding as

a matter of law that Armor's medical providers, namely, Dr. Sanchez and Nurse Cador, were unaware of facts from which the inference could be drawn that Decedent faced a substantial risk of serious harm upon arrival at the NCCC.  To resolve these disputes of fact, the jury will have to make credibility judgments, which the Court cannot do at this stage.  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (at summary judgment stage, the court must "eschew credibility assessments").

Here, the objective test is straightforward.  Whether viewed as a failure to provide Decedent any medical treatment -- in the sense that Armor did not treat Decedent's heart condition -- or as an inadequate course of treatment, a rational jury could conclude from the evidence submitted that the deprivation of adequate medical care was sufficiently serious.  There is no dispute that Decedent's undiagnosed heart condition was sufficiently serious.  See Adams v. Franklin, 111 F. Supp. 2d 1255, 1270 (M.D. Ala. 2000) (finding medical condition sufficiently serious where delay in treating plaintiff with heart condition who was suffering chest pains and shortness of breath resulted in plaintiff spending "two days in intensive care" and could have resulted in death).  Further, reasonable jurors could conclude that Armor's alleged delay in treating Decedent's heart condition presented a serious risk of harm to Decedent and resulted in the

deterioration of his health and ultimate demise.  See Smith, 316 F.3d at 186-87; Demata, 198 F.3d 233; Bilal, 494 F. App'x at 146.

Turning to the subjective test, the Court begins its analysis by clarifying that under the Eighth Amendment, which applies here because Decedent was a convicted prisoner serving out his sentence, the second prong of the test is not objective, as Plaintiff argues and Armor appears to concede, but rather subjective.[12]  So, Plaintiff's contentions that "the lesser standard of what a reasonable person would do under the circumstances" applies, and that Plaintiff "only must show that the treatment of the decedent was objectively unreasonable" are plainly wrong.  (Opp'n to Armor at 11.)[13]

---

[12] Equally puzzling is Plaintiff's reliance on several Eleventh Circuit decisions, not as persuasive authority, but rather to establish the standard for her Eighth Amendment claims. (Opp'n to Armor at 5-6.)

[13] To support her interpretation, Plaintiff selectively quotes a footnote in Darnell, which reads: "'Nothing about our interpretation of the proper standard for deliberate indifference[]. . . should be construed as affecting the standards for establishing liability based on a claim that challenged conditions are punitive." (Id. at 12 (quoting Darnell, 849 F.3d at 34, n.12).) However, in full, the footnote states:

> A pretrial detainee can establish a due process claim for inhumane conditions of confinement either by proving an official's deliberate indifference to those conditions, or by proving that that those conditions are punitive. Kingsley and its precedents are clear that the two theories of liability are distinct. Nothing about our interpretation of the proper standard for deliberate

Under the correct standard, which asks whether a reasonable jury could conclude that the Armor medical providers knew of and disregarded "an excessive risk to inmate health or safety," the Court focuses on the two primary instances in which Armor provided medical treatment to Decedent during his brief stay at the NCCC.  The first instance is Nurse McCormack's initial assessment of Decedent upon intake, as well as Dr. Sanchez's subsequent examination.  The second instance is Nurse Cador's assessment of Decedent shortly before his cardiac incident.

First, regarding the initial assessment by Nurse McCormack and Dr. Sanchez, at this juncture there are too many disputes of material fact relating to Dr. Sanchez's knowledge of the substantial risks of harm Decedent faced upon admission to the NCCC.  To start, after Nurse McCormack assessed Decedent, she

indifference _for due process purposes_ should be construed as affecting the standards for establishing liability based on a claim that challenged conditions are punitive.

_Darnell_, 849 F.3d at 34, n.12 (emphasis added; citation omitted).  Plaintiff blatantly omits the "due process purposes" clause of the footnote (emphasized above), as well as the footnote's opening sentence, both of which make abundantly clear that the _Darnell_ Court was referring to deliberate indifference claims arising under the Fourteenth Amendment, not the Eighth Amendment, which it confirmed can proceed "either by proving an official's deliberate indifference to [inhumane] conditions, or by proving that those conditions are punitive."  _Id._  Moreover, to the extent the footnote's message is ambiguous (it is not), since _Darnell_ the Second Circuit has reiterated that the Eighth and Fourteenth Amendments "embrace different definitions of the 'subjective' or 'mens rea prong.'"  _E.g._, _Horace v. Gibbs_, 802 F. App'x 13–14.

26

recommended Dr. Sanchez order an EKG and a chest X-ray in light of Decedent's admitted recent drug binge; anxious, disheveled, and aggressive state; and the fact that he had a recent EKG prior to his incarceration.  When Dr. Sanchez demurred, Nurse McCormack pressed him to at least examine Decedent in person.  Nurse McCormack testified that during that examination, Dr. Sanchez and Decedent discussed the latter's recent EKG.  Based on Dr. Sanchez's awareness of the foregoing facts, reasonable jurors could conclude that Dr. Sanchez knew of and disregarded an excessive risk to Decedent's health by ignoring the potential red flags, and the recommendations and protestations of Nurse McCormack, that Decedent was suffering from a serious and deadly heart condition. While the extent of Dr. Sanchez's awareness of Decedent's recent EKG is disputable, there is sufficient evidence in the record from which jurors could infer that Dr. Sanchez was aware of the EKG, a fact bearing on his awareness of the risk Decedent faced upon admission to the NCCC.

In any event, Armor cannot escape liability because Dr. Sanchez failed to "verify underlying facts" that might have confirmed Nurse McCormack's suspicion that Decedent's serious medical problem bore further investigation.  See Ruffin v. Deperio, 97 F. Supp. 2d 346, 354 (W.D.N.Y. 2000) ("A defendant may not escape liability if the evidence shows that he 'merely refused to verify underlying facts that he strongly suspected to be true, or

declined to confirm inferences of risk that he strongly suspected to exist.'" (quoting Farmer, 511 U.S. at 843 n.8)); see also Hudak v. Miller, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) (finding that the subjective element required a showing that the treating physician "knew that [the inmate] had some serious medical problem which bore further investigation"); Staten v. Semple, No. 18-CV-1251, 2021 WL 1060225, at *18 (D. Conn. Mar. 19, 2021).   Nurse McCormack's claim that portions of her examination notes recommending a chest X-ray went "missing" after Decedent's cardiac incident gives the Court further pause, as such a claim, if accepted by the jury, could demonstrate Armor's awareness that its course of treatment was reckless for purposes of Plaintiff's Eighth Amendment claim.[14]

With respect to Nurse Cador's examination shortly before Decedent's cardiac incident, there is a dispute of material fact as to whether Nurse Cador was aware of Decedent's complaints of chest pains, recorded in the Correctional Officer Desk Log, as well as Decedent's statement to Officer Meyer that he "felt like he was having a heart attack."[15]   In the event a jury declined to

---

[14] However, unlike Nurse Cador's decision to defer treatment on Decedent until the morning, there is no evidence in the record that Dr Sanchez's decision not to order an EKG or chest X-ray was motivated by Armor's profit.   See infra for further discussion regarding Armor's profit motive.

[15] Armor halfheartedly argues that Decedent's statement "seems to be in direct contravention of CPLR § 4519, also known as the Dead

credit Nurse Cador's assertion that he was not advised that Decedent was experiencing chest pains, it could reasonably conclude that Nurse Cador was both aware of facts indicating Decedent faced a substantial risk of cardiac injury, and that in deferring further treatment until the morning, acted on those facts, thus creating a substantial risk of harm to Decedent.[16]

---

Man's Statute." (Armor Reply at 6.) But where, as here, Plaintiff invokes the Court's federal question jurisdiction, the Federal Rules of Evidence apply. And because the Federal Rules of Evidence abolished many common-law rules, like state Dead Man's statutes, they do not apply in this case. Rosenfeld v. Basquiat, 78 F.3d 84, 88 (2d Cir. 1996).

[16] The County briefly argues the statements by unidentified correctional officers contained in the County's records are inadmissible hearsay. (County Reply at 4-5.) The County is correct that certain documents relied on by Plaintiff contain hearsay and even double hearsay. "A district court has broad discretion in choosing whether to admit evidence on summary judgment." HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC, 609 F. App'x 669, 671 (2d Cir. 2015). Because statements like those contained in the Correctional Officer Desk Log and other correctional officer's reports on the incident may be admissible under different exceptions to the hearsay rule that the County fails to address, the Court considers these statements for purposes of the present motions. See Fed. R. Evid. 803(6) (business records hearsay exception); Fed. R. Evid. 803(8) (public record hearsay exception); Fed. R. Evid. 803(5) (past recollection recorded hearsay exception). Moreover, it appears from the parties' JPTO that Plaintiff intends to call as witnesses the correctional officers who likely made these statements in their reports and to the NYS COC. See Hill v. Laird, No. 06-CV-0126, 2016 WL 3248332, at *7 (E.D.N.Y. June 13, 2016) ("[T]he Court may consider hearsay on a motion for summary judgment where there is a showing that admissible evidence will corroborate the hearsay at trial." (citing Isaacs v Mid Am. Body & Equipment Co., 720 F. Supp. 255, 256 (E.D.N.Y. 1989)).

Moreover, evidence in the record supports the theory that Armor was disinclined to send inmates to hospitals for medical treatment based on cost considerations. If proved at trial, _i.e.,_ if Plaintiff proves Nurse Cador deferred treating Decedent until the following morning to save costs on off-site medical care, the jury could find the subjective prong of Plaintiff's deliberate indifference claim satisfied based on Armor's profit motives. See Chance, 143 F.3d at 703 ("In certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." (quoting Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974)); Colon v. County of Nassau, No. 12-CV-4466, 2014 WL 4904692, at *7 (E.D.N.Y. Sept. 26, 2014) (Seybert, J.) ("[I]f Dr. Manetti subsequently denied Rodriguez medication based solely on Armor's budget, and not on actual medical need, Rodriguez could also establish the subjective prong of a deliberate indifference claim."); Jones v. Westchester County Dep't of Corr. Med. Dep't, 557 F. Supp. 2d 408, 415 (S.D.N.Y. 2008).

As a result, the Court finds there are triable issues of material fact regarding Plaintiff's Eighth Amendment claim for deliberate indifference to medical needs.

2. _Monell_'s Policy Requirement

Next, the Court turns to Monell's requirement that Plaintiff demonstrate the County and Armor violated Decedent's

Eighth Amendment rights pursuant to a policy or custom.   For substantially the same reasons as Judge Donnelly's well-reasoned decision in <u>Gleeson v. County of Nassau</u>, No. 15-CV-6487, 2019 WL 4754326 (E.D.N.Y. Sept. 30, 2019), which neither party cites, the Court finds Plaintiff can proceed on her <u>Monell</u> claims against the County and Armor.

###### i.   Applicable Law

The plaintiff can satisfy the municipal "policy or custom" requirement by alleging:

> (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff.

<u>Ying Li v. City of New York</u>, 246 F. Supp. 3d 578, 636 (E.D.N.Y. 2017) (citing Second Circuit decisions); <u>see also</u> <u>Vives v. City of New York</u>, 524 F.3d 346, 353 (2d Cir. 2008) (official policy); <u>Hu v. City of New York</u>, 927 F.3d 81, 105 (2d Cir. 2019) (action by official with policymaking authority); <u>Lucente v. County of Suffolk</u>, 980 F.3d 284, 297-308 (2d Cir. 2020) (persistent and widespread custom and practice); <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 127 (2d Cir. 2004) (failure to train or supervise); <u>Reynolds v. Giuliani</u>, 506 F.3d 183, 191-93 (2d Cir.

2007) (failure to supervise); Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) (failure to supervise); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) (failure to discipline).

"In order to establish Monell liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" Lucente, 980 F.3d at 297-98 (quoting Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992)). "In other words, there must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'" Id. at 298 (quoting Jones v. Town of East Haven, 691 F.3d 72, 82 (2d Cir. 2012)).

A failure to supervise "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." Wray v. City of New York, 490 F.3d 189, 195-96 (2d Cir. 2007) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). To prevail on this theory, the plaintiff must demonstrate that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them,

32

effectively ratifying the actions." <u>Amnesty Am.</u>, 361 F.3d at 126 (citation omitted). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence 'may be properly thought of as a city policy or custom that is actionable under § 1983.'" <u>Id.</u> (quoting <u>City of Canton</u>, 489 U.S. at 388).

ii. <u>Application to Armor</u>

Plaintiff argues that Armor had a widespread and well-settled custom of providing inadequate medical care to prison inmates. (Opp'n to Armor at 24 ("[D]efendants are liable for Mr. Marinaccio's death because the defendants had policies or customs of delivering inadequate healthcare to NCCC inmates.").)[17]   To support her theory, Plaintiff points to the NYS COC reports and the Nassau County Comptroller Audit Report on Armor. (<u>Id.</u> at 20.)

Courts in this district "have defined 'widespread' to mean that the unconstitutional acts in question are 'common or prevalent throughout the [entity]' and "well-settled" to mean that the unconstitutional acts "have achieved permanent, or close to

---

[17] Plaintiff also appears to allege that Armor's formal policy of requiring approval from its corporate office in Florida before referring patients to the hospital caused Decedent's death here. However, unlike in <u>Gleeson</u>, there is no evidence that Armor clinicians intended to refer Decedent to see an off-site specialist but failed to do so timely due to Armor's policy. 2019 WL 4754326, at *14-15. As a result, it cannot be said that this policy caused the constitutional tort alleged here.

permanent, status." <u>Gleeson</u>, 2019 WL 4754326, at *15 (quoting <u>Fowler v. City of New York</u>, No. 13-CV-2372, 2019 WL 1368994, at *14 (E.D.N.Y. Mar. 26, 2019)).  While there is "no 'magic number' of instances of unconstitutional conduct that will suffice to permit the inference of a broader municipal policy or custom," <u>Fowler</u>, 2019 WL 1368994, at *14, where the plaintiff relies on government reports, like the NYS COC and Comptroller Audit relied on here, the Court must ensure "those reports are sufficiently connected to the specific facts of the case," <u>Isaac v. City of New York</u>, No. 16-CV-4729, 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018) (quoting <u>Gomez v. City of New York</u>, No. 16-CV-1274, 2017 WL 1034690, at *11 (E.D.N.Y. Mar. 16, 2017)), <u>report and recommendation adopted</u>, 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018).

The NYS COC reports and Comptroller Audit detail similar instances of Armor's failure to deliver adequate medical care to inmates at the NCCC during the same period in which Decedent's incident occurred.  The NYS COC referred to these deficiencies as systemic.  Accordingly, the Court finds Plaintiff has raised a genuine issue of material fact as to whether Armor has a widespread and well-settled custom of providing inadequate medical care to prison inmates. <u>Gleeson</u>, 2019 WL 4754326, at *15.

iii. <u>Application to the County</u>

Plaintiff may proceed against the County on a failure-to-supervise theory of <u>Monell</u> liability.[18]  Specifically, a reasonable jury could find that the NYS COC reports alerted the County, through its policymaker Sheriff Sposato, to a potentially serious problem of unconstitutional conduct, such that the need for greater supervision was obvious.  Indeed, these reports consistently recommended that the County conduct an inquiry into the fitness of Armor to provide correctional medical care at the NCCC.  But "[r]ather than address the obvious need for closer supervision," there is support in the record for the proposition that the County "scaled back its oversight." <u>Gleeson</u>, 2019 WL 4754326, at *17.  For example, the County left vacant the Health Contractor Administrator position, a position designated to oversee administration of and monitor compliance with the contract between Armor and the County.  Further, the QIC responsible for quality improvement activities consistent with the provisions of

---

[18] Following <u>Gleeson</u>, the Court declines to adopt Plaintiff's position, accepted by the Eleventh Circuit in <u>Ancata v Prison Health Services Inc.</u>, 769 F.2d 700 (11th Cir. 1985) but not adopted by this Circuit, that <u>respondeat superior</u>, absent a municipal policy, is a viable theory of liability in cases involving the failure to provide adequate medical care.  <u>Gleeson</u>, 2019 WL 4754326, at *16.  Further, the Court rejects Plaintiff's official policy theory, premised on the County's decision to approve and renew its contract with Armor, on the grounds that the County's decision to approve and renew the contract with Armor is too far removed from the incident giving rise to this action.  <u>Id.</u> at *16, n.24.

the DOJ Settlement did not meet monthly with Sheriff Sposato, as the contract required.  As the Comptroller Audit found, the County "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (County Comptroller Audit at ii.)  For these reasons, Plaintiff has raised a genuine issue of material fact as to whether these failures to supervise Armor amount to deliberate indifference to the rights of inmates at the NCCC.

*     *     *

Accordingly, Defendants' respective motions for summary judgment as to Plaintiff's Monell claims are DENIED, and Plaintiff is permitted to proceed with Monell claim pursuant to the theories approved herein.

### 3.  Damages

Armor raises two damages-related arguments.  First, Armor argues that Plaintiff cannot recover reasonable attorney's fees under 42 U.S.C. § 1988, because Plaintiff cannot prevail on her Section 1983 claims.  However, because Plaintiff's Section 1983 claims can proceed to trial, Armor's contention is premature.

Second, Armor argues that it is immune from Plaintiff's claim for punitive damages.  It is well established that punitive damages may be imposed under Section 1983 against an individual defendant who acts with "reckless or callous disregard for the plaintiff's rights." Smith v. Wade, 461 U.S. 30, 51 (1983).

However, punitive damages may not be imposed on municipalities. Newport v. Fact Checkers, Inc., 453 U.S. 247, 263 (1981). The Supreme Court's conclusion in Fact Checkers that Section 1983 did not authorize punitive damages awards from municipalities rested on two considerations. First, historically, courts in the United States "that had considered the issue prior to 1871," the year Section 1983 was enacted, "were virtually unanimous in denying such damages against a municipal corporation." Id. at 260. "Given that municipal immunity from punitive damages was well established at common law by 1871," the Court found the absence of "evidence that Congress intended to disturb this common-law immunity" telling. Id. at 263-66. Nor did "consideration of public policy dictate a contrary result." Id. at 266. Rather, the Court reasoned that the "award of punitive damages against a municipality 'punishes' only the taxpayers," and would therefore have little deterrent effect on misbehavior by government officials. Id. at 267-70.

Essentially, Armor argues that, as a "state actor" for Section 1983 purposes, it steps into the County's shoes and should be entitled to the same protections against punitive damages that are afforded the County. (Armor Reply at 10.) However, as several courts have found, the rationale behind the Supreme Court's conclusion that Section 1983 does not authorize punitive damages awards from municipalities is less persuasive when applied to

private entities.   See Segler v. Clark County, 142 F. Supp. 2d 1264, 1268 (D. Nev. 2001) (finding a private corporation that contracted to provide medical care to inmates in Nevada prisons could be subject to imposition of punitive damages); Campbell v. Pennsylvania Sch. Boards Ass'n, No. 18-CV-0892, 2018 WL 3092292, at *6 (E.D. Pa. June 20, 2018) (same as to voluntary school board association); Phelan ex rel. Phelan v. Torres, No. 04-CV-3538, 2005 WL 4655382, at *16 (E.D.N.Y. Sept. 20, 2005) (same as to non-profit contractor for the State of New York); Barbara Kritchevsky, Civil Rights Liability of Private Entities, 26 Cardozo L. Rev. 35, 68-69 (2004).

Historically, private corporations have been subject to punitive damages.  Kritchevsky, supra, at 77 n.293 (collecting cases and treatises for proposition that corporations were not immune from liability for punitive damages in 1871).  Further, an award of punitive damages against Armor "would not punish taxpayers in the way such a decision would affect a municipality.  Instead, punitive damages would be assessed against [Armor,] which would bear the burden of payment as a private corporation" and may be deterred as a result.  Segler, 142 F. Supp. 2d at 1269.[19]

---

[19] Although Armor does not make the argument, the Court recognizes that local governmental entities may opt to indemnify government officials for punitive damages, thus potentially undermining the taxpayer rationale at the municipal level.  See Martin A. Schwartz, Should Juries Be Informed That Municipality Will Indemnify Officer's [Section] 1983 Liability for Constitutional Wrongdoing?,

The Court will not cloak Armor in the protection against punitive damages afforded to municipalities just because it has been deemed a state actor for Section 1983 purposes.  Accordingly, Armor's motion for summary judgment as to Plaintiff's claims for punitive damages is DENIED.

    B.   <u>New York State Law Claims</u>

        1.   <u>Wrongful Death</u>

Next, the Court addresses Plaintiff's New York State law claim for wrongful death.  "To prevail on a claim for wrongful death under New York law, a plaintiff must establish the following elements: '(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent.'" <u>Ryan v. County of Nassau</u>, No. 12-CV-5343, 2016 WL 11500151, at *8 (E.D.N.Y. Mar. 31, 2016) (Seybert, J.) (quoting <u>Chong v. N.Y.C. Tran. Auth</u>., 441 N.Y.S.2d 24, 25 (N.Y. App. Div. 2d Dep't 1981)). Armor contends that Plaintiff has failed to submit any evidence to support her claim for pecuniary loss, while the County appears to

---

86 Iowa L. Rev. 1209, 1249 n.49 (2001) (including Nassau County in list of states and municipalities that permit indemnification for punitive damages, albeit only for police officers).  However, the Supreme Court acknowledged this fact in <u>Fact Checkers</u> and did not believe it undermined its decision.  453 U.S. at 269 n.30.

argue that it cannot be held liable for Armor's allegedly negligent conduct in treating Decedent.[20]

First, the Court disagrees with the County that it cannot be held liable for wrongful death here.  Plaintiff may hold the County liable for wrongful death under the doctrine of respondeat superior, provided the County's employees committed the allegedly tortious acts while acting within the scope of their employment. Perez v. City of New York, 912 N.Y.S.2d 691, 692 (N.Y. App. Div. 2nd Dep't 2010); see also Triolo v. Nassau County, 24 F.4th 98, 111 (2d Cir. 2022); 62 N.Y. Jur. 2d Government Tort Liability § 43.

In the present action, there is no competent evidence that County employees, i.e., the responding correctional officers, committed a tortious act while responding to the medical emergency that led to Decedent's death.  However, the Court must determine whether the County can be vicariously liable for the negligent acts of its independent contractor, Armor.  While "[t]he general rule is that a party who retains an independent contractor, as distinguished from a mere employee or servant, is not liable for the independent contractor's negligent acts," Kleeman v.

---

[20] To the extent the County argues that Plaintiff's wrongful death claim fails because she never amended the Complaint to name the John and Jane Doe individuals who allegedly provided Decedent with inadequate medical treatment, such argument misses the mark, because Plaintiff is proceeding under a respondeat superior theory of liability.

Rheingold, 614 N.E.2d 712, 715 (N.Y. 1993) (citations omitted), there are several exceptions to this general rule.

One exception of particular relevance in this instance is the exception for nondelegable duties.  Id.  "[A] municipality that delegates a duty for which the municipality is legally responsible, such as the maintenance of its roads, to an independent contractor remains vicariously liable for the contractor's negligence."  Rangolan v. County of Nassau, 749 N.E.2d 178, 182 (N.Y. 2001).  Here, it is undisputed that the County was mandated by New York State and County law to provide for the care and safety of the inmates held at the NCCC, and that Sheriff Sposato was responsible for the daily operation of the NCCC under applicable law.  N.Y. Correct. Law § 500-c ("[T]he sheriff of each county shall have custody of the county jail of such county.").  Thus, in these circumstances, the County cannot escape vicarious liability for the allegedly tortious acts of Armor that Plaintiff claims led to Decedent's wrongful death.[21]

Next, the Court addresses Armor's contention that Plaintiff has not established her claim for pecuniary loss beyond funeral and burial expenses.  "[T]o defeat a motion for summary judgment in a wrongful death case, the plaintiff must offer proof

---

[21] The Court finds the County's motion for summary judgment as to Plaintiff's claims for "mistakes in medical care," "failure to treat/diagnose," and "negligence" fails for the same reasons.

of pecuniary loss," such as loss of support, voluntary assistance, or inheritance. Singleton v. City of Newburgh, 1 F. Supp. 2d 306, 317 (S.D.N.Y. 1998) (citing Gonzalez v. New York City Housing Auth., 572 N.E.2d 598 (N.Y. 1991)). Here, Plaintiff's Local Rule 56.1 Counterstatement is silent on whether Decedent's distributees suffered pecuniary loss by reason of his death. Instead, to supports her claim of pecuniary loss, Plaintiff points to the deposition testimony of Decedent's sister and administrator, Gloria Gazzola. (Gazzola Depo. Tr., attached to Demiris Decl.) But Gazzola's testimony undermines her claim for pecuniary loss. Gazzola testified that her brother lived with his mother for "[m]ost of his life," did not have any children or dependents, and had not worked for more than five years. (Id. at 6-11.)[22] Thus, in this case, Plaintiff has not "presented evidence that she -- or any other person -- suffered pecuniary loss as a result of [Decedent's] death" beyond funeral and burial expenses. Singleton, 1 F. Supp. at 317. As a result, Plaintiff's damages for wrongful death, if any, will be limited to funeral and burial expenses proven at trial.

Accordingly, the County's motion for summary judgment as to Plaintiff's wrongful death and related negligence claims is

---

[22] Out of an abundance of caution, the Court has also reviewed the Complaint and the parties' JPTO for proof of pecuniary loss but finds none.

DENIED, and Armor's motion for summary judgment as to Plaintiff's wrongful death claim is GRANTED to the extent Plaintiff is limited to recovering for funeral and burial expenses on this claim.

2.   Intentional Infliction of Emotional Distress

Next, Defendants ask the Court for summary judgment on Plaintiff's intentional infliction of emotional distress claim. Intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Greenaway v. County of Nassau, 97 F. Supp. 3d 225, 239-40 (E.D.N.Y. 2015) (quoting Howell v. N.Y. Post Co., Inc., 81 N.Y.2d 115 (N.Y. 1993)). To constitute "extreme and outrageous conduct," it must "go beyond all possible bounds of decency" and be "atrocious, and utterly intolerable in a civilized community." Greenaway, 97 F. Supp. 3d at 239-40 (citations omitted).  The tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." Salmon v. Blesser, 802 F.3d 249, 256 (2d Cir. 2015) (internal citation and quotation marks omitted).

Here, the record does not sustain an intentional infliction of emotion distress claim.  First, "[i]t is well settled that public policy bars claims sounding in intentional infliction

of emotional distress against a government entity" like the County. J.H. v. Bratton, 248 F. Supp. 3d 401, 416 n.10 (E.D.N.Y. 2017). Further, "no reasonable juror would find that the evidence on this record establishes conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" Gleeson, 2019 WL 4754326, at *18 (quoting Chanko v. Am. Broad. Cos. Inc., 27 N.Y.3d 46, 56 (N.Y. 2016) (granting summary judgment on intentional infliction of emotional distress claims in analogous circumstances)).

Accordingly, Defendants' respective motions for summary judgment as to Plaintiff's claims for intentional infliction of emotional distress are GRANTED.

### 3. Remaining Claims and Defendants

Plaintiff asserts several additional claims under New York State law and against untenable Defendants such as the NCCC and the Nassau County Sheriff's Department.

To begin, it is well established that Plaintiff cannot maintain claims against the Nassau County Sheriff's Department, because it is an administrative arm of the County that cannot be sued separately. Anderson v. Incorporated Village of Hempstead, No. 15-CV-1485, 2022 WL 267875, at *5, n.4 (E.D.N.Y. Jan. 28, 2022); Dudek v. Nassau County Sheriff's Dep't, 991 F. Supp. 2d 402, 410 (E.D.N.Y. 2013). For the same reason, Plaintiff cannot maintain her claims against the NCCC. Adesola v. County of Nassau

Sheriff's Dep't, No. 12-CV-1026, 2012 WL 928316, at *3 (E.D.N.Y. Mar. 13, 2012). Accordingly, Plaintiff's claims against the Nassau County Sheriff's Department and the NCCC are DISMISSED.

Second, with respect to Plaintiff's failure-to-train claim, "a cause of action sounding in negligence is legally sustainable against a city when the injured party demonstrates that he was injured due to the negligent training and supervision of a law enforcement officer." Noonan v. City of New York, No. 14-CV-4084, 2015 WL 3948836, at *8 (S.D.N.Y. June 26, 2015) (quoting Barr v. Albany County, 406 N.E.2d 481, 485 (N.Y. 1980)). However, Plaintiff has not adduced any evidence regarding Armor or the County's allegedly negligent training program, and her claims cannot proceed on "conclusory allegations of a deficiency in training." Id. (citing Rodriguez v. City of New York, 649 F. Supp. 2d 301, 307-08 (S.D.N.Y. 2009) (finding that conclusory allegations insufficient to sustain a Section 1983 failure to train claim also "doom the plaintiff's [parallel] state law claim for failure to train")). As a result, Plaintiff's failure-to-train claims grounded in New York State law are DISMISSED.

\*     \*     \*

To the extent not expressly addressed, the Court has considered the parties' remaining arguments and finds them to be without merit.

CONCLUSION

Accordingly, for the stated reasons, **IT IS ORDERED** that:

1)   The Court GRANTS in part and DENIES in part Armor's (ECF
     No. 61) and the County's (ECF No. 58) respective motions
     for summary judgment, with the motions:

     a.   GRANTED with respect to Plaintiff's New York State
          law claims for intentional infliction of emotional
          distress and failure to train; and

     b.   GRANTED with respect to Plaintiff's wrongful death
          claim to the extent that, if proven, Plaintiff may
          only recover on this claim for funeral and burial
          expenses.

     c.   DENIED with respect to Plaintiff's Eighth Amendment
          claims under <u>Monell</u> (under the theories approved
          herein) and her remaining New York State law
          claims;

2)   The Court DENIES Armor's motion for summary judgment as
     to Plaintiff's claim for punitive damages;

3)   All claims against the Nassau County Correctional
     Center, Nassau County Sheriff's Department, and the John
     and Jane Doe Defendants are DISMISSED, and the Clerk of
     the Court shall TERMINATE these entities as parties to
     this action;

4)    The Clerk of the Court shall TERMINATE the motion pending at ECF No. 73;

5)    **On or before July 1, 2022, the parties shall file a letter advising whether they wish to be referred to the Court's Trial Ready Rapid Mediation Program**; and

6)    The parties shall use the following caption in all future filings:

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
GLORIA GAZZOLA, Individually and as
Administrator of the Estate of
ANTONIO MARINACCIO, JR.,

                  Plaintiff,
                                        MEMORANDUM & ORDER
            -against-                   16-CV-0909(JS)(AYS)

COUNTY OF NASSAU; ARMOR CORRECTIONAL
HEALTH   SERVICES,   INC.;   and   ARMOR
CORRECTIONAL HEALTH SERVICES OF NEW
YORK, INC.

                  Defendants.
----------------------------------X
```

**SO ORDERED.**


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.


Dated: June  23 , 2022
        Central Islip, New York